STATE ex rel. JUGLER v. GROVER et al.

No. 6393.  Decided April 29, 1942.   (125 P. 2d 807.)

See 22 R. C. L., 401; 46 C. J., Officers, sec. 49.

*Wade M. Johnson, of Ogden,* for relator.

Grover A. Giles, Atty. Gen., and A. U. Miner and Calvin
L. Rampton, Deputy Attys. Gen., for defendants.

LARSON, Justice.

An action in quo warranto to determine the right to the
office of a member of the Industrial Commission of Utah.
Pursuant to Section 42-1-1, R. S. U. 1933, Henry H. Blood
as governor of the State of Utah, by and with the advice
and consent of the State Senate, had in 1934 appointed
O. F. McShane; in 1936 had appointed Wm. M. Knerr; and
in 1938 had appointed the relator, Frank Jugler, as mem-
bers of the Industrial Commission of Utah, each for a term
of six years. Each of said members had duly qualified, taken
office, and were discharging the duties thereof. Under the
terms of the statute, McShane's term of office expired
April 1, 1941; Knerr's term would expire April 1, 1943, and
the term of Jugler, relator herein, would expire April 1,
1945. In March, 1941 the legislature passed and the gov-
ernor signed an act amending several sections of Title 42,
R. S. U. 1933, commonly called the Industrial Commission
Act, and enacting four new sections. Laws 1941, 1st Sp.
Sess., c. 15. This action involves Section 42-1-1, as amended,
and a new section, numbered Section 3. The original sec-
tion, 42-1-1, as far as material here reads:

"The industrial commission of Utah shall be composed of three mem-
bers, appointed by the governor by and with the consent of the senate,
whose terms of office shall be six years, beginning on the 1st day of
April. Each commissioner shall hold office until his successor is ap-
pointed and has qualified.   *   *   *"

As amended it reads:

"Section 42-1-1, Laws of Utah 1941:
"The industrial commission of Utah shall be composed of three mem-
bers, appointed by the governor by and with the consent of the senate,
whose terms of office shall be six years except as hereinafter pro-
vided in this section. Of the members first appointed the term of one
shall expire March 1, 1943, the term of one shall expire March 1, 1945,
and the term of one shall expire March 1, 1947. Each commissioner shall

hold office until his successor is appointed and has qualified.  *  *  *"
(Italics added.)

And the new section, Section 3, reads as follows:

"The terms of office of the present members of the industrial com-
mission of Utah shall terminate upon the appointment and qualifica-
tion *of the three members* of the industrial commission appointed pur-
suant to this act." (Italics added.)

Pursuant to this action Governor Herbert B. Maw, on
June 3, 1941, nominated and sent to the Senate for its
advice and consent:

"For members of the Industrial Commission:
Wendell Grover, 6 year term, Salt Lake County
Otto A. Wiesley, 4 year term, Salt Lake County
Wm. M. Knerr, 2 year term, Salt Lake County."

Three days later the senate confirmed the appointments.
The appointees took the oath, filed a bond, and assumed to
act as the Industrial Commission of Utah. In 1940, one of
the appointees, defendant Wendell Grover, was elected to
the state senate for a term of four years, to wit, from the
1st day of January, 1941 to the 1st day of January, 1945,
qualified as such senator and was president of the senate
during the regular and the first special session of the leg-
islature in 1941 when the foregoing changes were made in
the industrial commission law.

Article 6, Section 7, of the Constitution of the State of
Utah reads:

"[Ineligibility of members to office created, etc.] No member of
the Legislature, during the term for which he was elected, shall be
appointed or elected to any civil office of profit under this State,
which shall have been created, or the emoluments of which shall have
been increased, during the term for which he was elected."

Frank Jugler, hereinafter called the relator, instituted
this action against Wendell Grover and Otto Wiesley, as
defendants, to determine the right to the office as a member

of the Industrial Commission of Utah. Hereafter defendants will be referred to by name for clarity of record. Knerr was not made a defendant because he was a member of the old commission with two years to serve, and if relator's position is well taken, Knerr would now be lawfully holding his office under his prior appointment by Governor Blood.

Relator's position is that defendant Grover is ineligible to the office under the constitutional provision quoted because he was a member of the legislature; that under the provisions of Section 3, quoted above, the term of office of the old members of the commission did not cease or terminate until *three* eligible new commissioners had been appointed and qualified. Since Grover could not qualify because ineligible, the tenure in the office of the old commissioners had not terminated under the terms of the statute and therefore neither defendant Grover nor Wiesley could assume the office.

It is evident from the wording of Section 3, quoted above, that the legislature intended that the term of office, the tenure in office of the old commissioners should all terminate at once, the time of termination being fixed as the time when the newly appointed commissioners had all been appointed and qualified to take over. It was not intended to fuse or mingle the two sets of commissioners. It is argued for Mr. Wiesley that since the term of McShane, the lone Republican on the commission, had expired and Wiesley was the only Republican appointed in 1941, Mr. Wiesley must be considered as appointed to McShane's place, and therefore be entitled to the office as an appointment to the old commission until the new commissioners are all appointed and qualified. This argument is not tenable. The term of office of McShane's successor under the prior law would be six years. The governor's appointments designated Grover for the six-year term and Wiesley for a four-year term, which would be under the prior statute the remaining period of the Jugler term. The communication of the gov-

ernor to the senate, making the appointments and requesting confirmation clearly show that the appointments were made under the enactment of 1941 and not under the prior statute. If the defendant Grover is ineligible and therefore is not qualified, Wiesley is not yet a qualified member of the commission. Thus in *Com.* v. *Hanley*, 9 Pa. 513, Hanley was duly elected clerk of the orphan's courts in October, 1845, and was duly commissioned and qualified to serve for the period of three years from the 1st day of December of that year; and until his successor should be duly qualified. On the second Tuesday of October, 1848, Oliver Brooks was duly elected as his successor, but died before qualifying. The governor, assuming that Hanley's office became vacant at the expiration of three years, appointed a successor. In discussing the questions arising under these facts the Supreme Court of Pennsylvania said:

"Being duly qualified in the constitutional sense, and in the ordinary acceptation of the words, unquestionably means that he, *the successor, shall possess every qualification;* that he shall, in all respects, comply with every requisite before entering on the duties of the office; that, in addition to being elected by the qualified electors, he shall be commissioned by the governor, give bond as required by law, and that he shall be bound by oath or affirmation * * * to support the constitution of the commonwealth and to perform the duties of the office with fidelity. Until all these pre-requisites are complied with by his successor * * * the respondent is *de jure*, as well as *de facto*, the clerk of the Orphans' Court." (Italics added.)

And in *State* v. *Berg*, 50 Ind. 496, the Indiana Court held that where a township trustee was elected his own successor, and did not qualify under his second election that his office did not become vacant, and that he was entitled to hold under his first election until a successor was elected and qualified.

The weight of authority is that where there exists a constitutional provision such as we are now considering, that a term of office fixed by statute runs not only for the period fixed, but for an additional period between the date fixed for its termination and the date at which a successor

shall be qualified to take the office, the period between the expiration of the term fixed by statute and the time at which a successor shall be qualified to take the office is as much a part of the incumbent's term as the fixed statutory period. *Tuley* v. *State,* 1 Ind. 500; *Miller* v. *Burger,* 2 Ind. 337; *Baker* v. *Kirk,* 33 Ind. 517; *State* v. *Berg,* supra; *Elam* v. *State,* 75 Ind. 518; *People* v. *Whitman,* 10 Cal. 38; *Gosman* v. *State,* 106 Ind. 203, 6 N. E. 349; and *State* v. *Harrison,* 113 Ind. 434, 16 N. E. 384, 3 Am. St. Rep. 663.

The same court in *Kimberlin* v. *State,* 130 Ind. 120, 29 N. E. 773, 774, 14 L. R. A. 858, 30 Am. St. Rep. 208, said:

"The adjudicated cases seem to be harmonious in holding that, where one is lawfully in the possession of an office under a constitutional or statutory provision to the effect that he shall hold until his successor is elected and qualified, his right to hold over continues until a *qualified successor has been elected* by the same electoral body as that to which such incumbent owes his election, or which by law is entitled to elect a successor. *Gosman* v. *State,* 106 Ind. 203, 6 N. E. 349; *State* v. *Lusk,* 18 Mo. 333; *People* v. *Tilton,* 37 Cal. 614; *Ex Parte Lawthorne* [59 Va. 85] 18 Grat. 85; *Johnson* v. *Mann,* 77 Va. 265; *State* v. *Jenkins,* 43 Mo. 261; *State* v. *Harrison,* 113 Ind. 434, 16 N. E. 384, [3 Am. St. Rep. 663].

\*       \*       \*       \*

"But does it follow that, because Brown was elected, and failed to qualify, the office of township trustee became vacant, and the board of commissioners acquired the right to appoint? The rule is that, where a person is in the possession of an office under a constitutional or statutory provision like that found in our constitution, and a successor is duly elected, but dies before he qualifies, no vacancy occurs, since one of the contingencies upon which the incumbent's term of office is to expire has not taken place, namely, the qualification of a successor."

The Connecticut Court in *State* v. *Bulkeley,* 61 Conn. 287, 23 A. 186, 14 L. R. A. 657, said:

"The case finds that the respondent, Morgan G. Bulkely, was legally elected governor by the general assembly on the 10th day of January, 1889 (there having been no election by the people), and entered at once upon the duties of that office. The term for which he was elected was till the Wednesday following the first Monday of January, 1891,

and until his successor was duly qualified. If, then, no successor to him has been chosen, or, being chosen, has not become duly qualified, the respondent still holds the office of governor. He holds that office since the said Wednesday in January, 1891, by the same warrant that he held it prior to that date, and continues to be the *de jure governor* of the state.

\* \* \* \*

"The election of a governor is the selection of some person to fill that office. *The selection must be one who possesses the required qualifications,* and must be made by those who possess the right to vote, and at a time, place, and in the manner prescribed by law. The election of state officers in this state is a process.

\* \* \* \*

"But, as the right of the respondent depends upon the election of the relator to that office, it is really the title of the relator that is on trial. If the relator has been completely elected, then the right of the respondent to hold the office is ended. If the relator has not been elected then the right of the respondent continues." (Italics added.)

*Wood* v. *Miller,* 154 Ark. 318, 242 S. W. 573; *Baker, Governor,* v. *Kirk,* 33 Ind. 517; *Kimble* v. *Bender,* 173 Md. 608, 196 A. 409.

In *State* v. *Clausen,* 107 Wash. 667, 182 P. 610, 613, in a similar situation the court said:

"Other than the one just discussed, there is no objection to the validity of the act. The provision found to be unenforceable because of the ineligibility of a member of the Legislature to membership on the commission must be considered as directory, and easily separable from the remainder of the law without affecting its validity. Manifestly, one of the dominant ideas of the act concerning the membership of the commission is that 'the Governor shall appoint a commission, consisting of five citizens of the state of Washington,' and if, by reason of a deep interest in the important subject-matter, the Legislature suggests a rank or class denied by the constitution from which a member of the commission should be chosen by the appointive power, such situation will in no sense deprive the Governor of the right and power to appoint some other citizen of the state, eligible to be a member of the commission, instead of the one determined to be ineligible."

Counsel for Jugler argues that the legislature in 1941 created a new Industrial Commission, for appointment to which Grover was disqualified, and therefore Wiesley could

not assume office until a qualified person was named by the governor in place of Grover. The Act of 1941 does not create a new industrial commission, but that does not help Wiesley who contends that the 1941 act merely shortens the term in office of the then existing commissioners. In either event, Wiesley's tenure in the office could not begin under the terms of the Act until three qualified men had been appointed and had done all things needful for taking, assuming and lawfully holding the office.

We come now to the real crux of the case: Is Grover ineligible under the constitution to appointment to the industrial commission? Was the position to which he has been appointed on the industrial commission an office created by the legislature of which he was a member, that is, the legislature of 1941? If so, he is disqualified and ineligible by the provisions of the constitution cited above. If it was not so created, within the meaning of the constitutional inhibition, then Grover may hold the office.

The meaning of this provision of the constitution has never, prior to this time, been before this court, but the provision is not new or exceptional. It is found in Section 6 of Article 1 of the federal constitution. Twenty-three states' constitutions have identical provisions. Fourteen state constitutions have provisions which prohibit any member of the legislature from being appointed to, or from holding, any other public position of trust or profit in the state during the term for which he was elected to the legislature. Eleven states have no such provisions in their constitutions but one of them, Idaho, has a statute in effect the same as our constitutional provision. In the study of the various state constitutions it is interesting to note that the newer or more recently adopted constitutions, and practically all constitutions that have been amended on this point since originally adopted, have made the inhibition against legislators receiving or accepting appointive office more rigid, to bar them from any office, even though not created by a legislature of which they were members. In California

in 1916 the people by initiative petition enacted an amendment to their constitution, Art. 4, § 19, barring legislators from holding or accepting any office, trust or employment under the state during the term for which they were elected to the legislature. In 1918, Massachussetts, which had theretofore relied upon a statute barring legislators from other office, wrote an inhibition similar to ours into the constitution. Const. Mass. Amend. Art. 65. From the record of the debates in that constitutional convention, we quote the following from Chapter XXIX, Volume 3, from the remarks of Mr. George:

"I think it generally has been considered if a man wants to be a candidate for the General Court or any elective office and the people want to elect him, they ought to have the right to elect him. But if a man goes out and secures an election to the General Court and he uses that position in order to bargain away some action of his or some influence that he may have gained by such election to secure an appointive position, I think it ought to be stopped in the same way that the Constitution of the United States stops it.

"* * * I believe that we should remove all opportunity of bargaining between the Governor and the Legislature. It was intended that the Legislature should be independent of the Governor; it was intended that the executive should be independent of the Legislature; and for a great many years, up to within the past ten years, it was a rare instance that the Governor ever invaded the Legislature to make an appointment."

And from the remarks of Mr. Clark:

"I am not quite certain whether the majority of the members of this Convention fully comprehend the importance of this matter or not. It has been shown by one of the gentlemen in the fourth division (Mr. Mahoney) that we have a legislative enactment that provides against the appointment of a member of the Legislature to any position which that Legislature creates. But the fact remains that in numerous instances—and I think those instances have been increasing in frequency in recent years,—if there is some good fellow in the Legislature who is popular and who would like the position, as I myself have seen on several occasions, his friends gather around him, they help to put that measure through, create that position, that commission or that office, whatever it may be, to give that good fellow an office. * * *"

And the situation was tersely put by Mr. Aylward in this language:

"I have paid very little heed to the arguments by the gentleman in the second division (Mr. Curtiss of Hingham) that sometimes some expert is in the Legislature who for some reason is eminently desirable to fill a position on one of these commissions. *It is much more desirable that the legislators always should have in mind that no act of theirs in any event shall promote them to a commission,* and that we will have a situation which will be such that their actions will not be controlled by the inducement that probably in the future they may be able to benefit themselves." (Italics added.)

The quotations are given as reflective of the state of mind of the people as to why such language is written into constitutions, and the meaning and purposes thereof. The Arizona constitution was similar to ours until 1938, when through the initiative process it was amended to exclude members of the legislature from any office or employment under the state or any county or city during the term for which they were elected to the legislature. Const. Ariz. Art. 4, § 5. In 1921 Louisiana wrote into its constitution a provision similar to ours except that it extended the disqualification for one year after the expiration of the legislative term. Const. La. Art. 3, § 12. In 1936 (during the Huey Long regime) the section was eliminated from the constitution. This is the only state we have found which has eliminated the constitutional inhibition once it was in the constitution.

Let us now examine what the courts have said and done about this constitutional provision. A constitution is intended to be framed in brief and concise language and represents the will and wisdom of the convention which framed it and the people who adopted it. That section of the constitution is a part of the organic law of the state, and in plain language prohibits senators and representatives from holding any office created by action of the legislature of which they were members. This provision was enacted for the protection and safety of our government. Said the

Supreme Court of Oklahoma in *Baskin* v. *State ex rel. Short,* 107 Okl. 272, 232 P. 388, 390, 40 A. L. R. 941:

"The above provision of the Constitution was enacted to prevent members of the legislative branch of the government from occupying a dual position, and to prohibit members of the Legislature from deriving *directly or indirectly* any pecuniary benefit of the *legislative enactments* or appropriations made by them. * * * This act was to prevent and prohibit members of the Legislature, after making appropriations for the other departments * * * from accepting employment from that branch of the government, and receive a pecuniary benefit from the money they appropriated." (Italics added.)

We quote from *Chenoweth* v. *Chambers,* 63 Cal. App. 104, 164 P. 428, 429, in speaking of the initated amendment to the California Constitution referred to above:

"The purpose of the amendment, as stated by one of its proponents in the official argument addressed to the electors, was to bring the Constitution into harmony with the American theory of government that 'those who execute the laws should not be the same individuals as those who make the laws,' and for the further reason 'that a legislator who is holding a position on the state pay roll is too apt to allow the wishes of the one responsible for his appointment to decide the manner in which his vote shall be cast. A man in such a position is, to say the least, not in that independent frame of mind which should be possessed by the ideal legislator.' "

The South Dakota court in *Palmer* v. *State,* 11 S. D. 78, 75 N. W. 818, 819, says:

"The language of the constitution is plain. Its meaning cannot be mistaken. The purpose of the provision is apparent. It is intended to preclude the possibility of any member deriving, *directly or indirectly, any pecuniary profit from legislation enacted by the legislature of which he is a member.* It is one of the most important of the many reforms attempted by the framers of our organic law. It is intended to remove any suspicion which might otherwise attach to the motives of members who advocate the creation of new offices or the expenditure of public funds." (Italics added.)

This provision in the Federal Constitution is said to be an admirable provision against venality. 1 Tuck. Black.

Comm. App. 198, 214, 215, 375, and Rawle on the Constitution in Chapter 19, p. 184 vindicates it with intense earnestness. Story, in his work on the Constitution, page 633, Vol. 1, says:

"The reason for excluding persons from office, who have been concerned in creating them, or increasing their emoluments, are to take away as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness."

The Michigan court in *Fife* v. *Kent County Clerk*, 149 Mich. 349, 112 N. W. 725, 726, said the purpose of these provisions is "to preserve a pure public policy." And in *Ellis* v. *Lennon*, 86 Mich. 468, 49 N. W. 308, 310, it said the purpose was

"to prevent officers from using their official positions in the *creation of offices for themselves or for the appointment of themselves to place.*" (Italics added.)

The Mississippi Court in *Brady* v. *West*, 50 Miss. 68, says:

"This is a wise provision of the constitution, designed as far as possible to preserve the purity of legislation, by putting the sting of disability into the temptation of members of the legislature to create offices of profit with a view to taking and holding them themselves."

From *Montgomery* v. *State ex rel. Enslen*, 107 Ala. 372, 18 So. 157, we quote:

"The evident intention of the framers of the Constitution was to prohibit the legislature from creating offices, or increasing the salary of officers for the possible benefit of any members thereof, and thereby to remove the temptation of prostituting their positions for private gain or preferment."

The Maryland Court in *Westernport* v. *Green*, 144 Md. 85, 86, 124 A. 403, 404, said:

"It was the obvious intent of the Constitutional provision we have quoted to protect the members of the Legislature from the influence upon their judgment and conduct, *of any personal interest* in the crea-

tion of new offices or the increase of the salaries or emoluments of any offices. * * * 'It will prohibit any person, being a member of either branch of the General Assembly, *from legislating* * * * *in order that he may be benefited by it.'* " (Italics added.)

In *State ex rel. Anderson* v. *Erickson,* 180 Minn. 246, 230 N. W. 637, 638, we read:

"All else aside, the plain purpose of the constitutional prohibition would be thwarted in proportion as we denied its effect upon any such officers, the *creation of whose official place* or the fixing or increasing of whose salary * * * are within the power of the Legislature. The purpose was to protect the taxpayers from *the working of selfish interest in the creation of public place* and the fixing of compensation for public service." (Italics added.)

From *Norbeck & Nicholson Co.* v. *State,* 32 S. D. 189, 142 N. W. 847, 849, Ann. Cas. 1916A, 229, we quote:

"A member of the state Legislature, by virtue of his office stands in a fiduciary and trust relation towards the state; in other words, he is the confidential agent of the state * * * and it seems to be almost universally held that it is against sound public policy to permit such an agent * * * to himself be directly or indirectly interested in any contract with the state or other municipality * * *. *The private interest of such an agent should not become antagonistic to his public duty.* * * * His duty to the town and his private interests thus became directly antagonistic. It matters not if he did in fact make his private interests subservient to his public duties. It is the relation that the law condemns, not the results. * * * this constitutional provision was enacted through fear that a legislator might be, *either consciously or unconsciously, influenced by selfish motives when voting for or against a bill.* * * * This constitutional provision was designed to prevent any legislator, while he should be serving the state in the enactment of laws, from being tempted and influenced, either consciously or unconsciously, by any selfish interests." (Italics added.)

The California Court, in *Satterwhite* v. *Garrison,* 34 Cal. App. 734, 168 P. 1053, 1054, expressed it thus:

"Upon the merits of the whole case we are of the opinion that the intent and purpose of the framers in proposing, and of the people in adopting, this constitutional provision was the preclusion of members

of the law-making branch of the state government from seeking or holding any appointive office or employment in or under any department or subdivision of the general state government by seeking or holding of which his independent action as such member of the Legislature might be in any wise influenced or affected."

15 Cal. Jur., P. 974; *State* v. *Clausen,* supra.

With this general view as to the purpose and construction basis of the constitutional provision, we turn now to the question: Is the office now held by defendant Grover one created by the legislature of 1941, within the purview of the constitutional provision? This question is presented in two ways: (a) Does Chapter 15, Laws of Utah 1941, 1st Sp. Sess., abolish the office of members of the Industrial Commission and recreate that office, that is, does it create a new Industrial Commission? (b) If not, was the action of the legislature in terminating the terms of office of the members of the Industrial Commission even though they had not expired by law, and so creating by the action of that legislature, a vacancy in office, a place to be filled, an office to which they could be appointed which would not otherwise have been available to appointment, the creation of an office within the prohibition of the constitution? We have already indicated that neither Grover nor Wiesley was appointed to fill the office on the old commission held under the prior statute by McShane. Since Knerr and Jugler were Democrats and McShane the Republican member, and the statute declares that not more than two members can belong to the same political party, Grover, a Democrat, could not be appointed in McShane's place. Nor is it contended Grover has any right or claim to the office except under and by virtue of the new enactment terminating the terms of office of the prior commission. As shown above, the purpose and intent of such constitutional provisions are to insure that no member of the legislature during the period for which he was elected *can profit or obtain any office by virtue of any enactments of the legislature of which he is a member.* The statute under which Jugler and Knerr were appointed

and qualified as members of the Industrial Commission provided that their terms of office were six years and until their successors were appointed and qualified. Section 42-1-1, R. S. U. 1933. There would be no opportunity or occasion for appointement of another in their places, or no power in the governor to make such appointment until the expiration of such terms, unless a vacancy occurred by death or resignation of a member, or unless such member was removed for inefficiency, neglect of duty, malfeasance or misfeasance in office as provided by Section 42-1-3, R. S. U. 1933. It is not contended that either Jugler or Knerr had been so removed, or had died or resigned. When the legislature convened in 1941, there was not any office or member of the industrial commission to which an appointment could be made, except as a successor to McShane, and such person could not be a member of the Democratic party. The offices held by Knerr or Jugler were not open to appointment. *It was only by virtue of an enactment of the legislature in 1941 that there was such an office in existence to which Grover could be appointed.* That office exists as one open to appointment by virtue of the act of the legislature of which Grover was a member. The appointment comes about not for a vacancy occurring under existing laws, or laws passed by a legislature of which Grover was not a member, but the office available to be filled was made in that condition; the vacancy, so as to make the office available to an appointment, was created by the legislature of 1941. Had it not been for the enactment, for the law passed, by that legislature the office to which Grover has been appointed would not have existed as an office to be filled by appointment of the governor. It exists because of the act of the legislature in creating a vacancy in an office —substantially creating a vacant office. It is because of the act of the legislature that the office exists as one to be filled, one to which an appointment could be made. And Grover was a member of that legislature. As shown above the purpose of the constitutional inhibition was to prohibit a member

of the legislature from appointment to any office made available by the act of such legislature. We have found no case exactly like the one before us. But a closely analogous situation existed in *Ellis* v. *Lennon,* 86 Mich. 468, 49 N. W. 308, 310. In that case Lennon was elected alderman of his home city for a two year term commencing April 10, 1890. In April, 1891, the council adopted a resolution that the council now proceed to appoint certain municipal officers including the chief of police. Lennon then resigned from the council and was appointed chief of police. The court in its opinion says:

"Was the respondent eligible at the time of his appointment?

"The office was created while respondent was an alderman and a member of the council. *Before his resignation the council resolved to appoint a chief of police,* and respondent voted in favor of such action. * * * Respondent then tendered his resignation, and at a subsequent meeting, nearly a year before the period for which he had been elected as alderman had expired, he was by resolution appointed chief of police." (Italics added.)

The opinion then quotes the statutes putting inhibitions upon aldermen being appointed to office, and the constitutional inhibition pertaining to members of the legislature, both of which are more drastic than ours, and then says:

"The purpose of these statutes is to prevent officers from using their official positions in the creation of offices for themselves *or for the appointment of themselves to place.* While the law concedes the right of resignation, it is its policy to take away all inducements to the vacation of office." (Italics added.)

While the case is based upon a statute more rigid in its inhibitions than ours, it is persuasive from the fact that it calls attention to the fact that the council provided for the appointment of new officers, to offices already existing, and thus made the post available.

In an early case of *State* v. *Clendenin,* 24 Ark. 78, 79, a very interesting case involving the effect of adopting a new constitution, it is said:

"Had the convention then abrogated the state constitution, and done nothing more, all of the powers of government exercised by the persons who then filled the offices under the constitution, would have gone back to the people, the source from whence they were derived; the offices would have ceased to exist, and the people of Arkansas would have been left in a state of nature, without a social compact or government. * * *

"The convention did abrogate the state constitution, but at the same moment of time they adopted a new *constitution*—for in legal effect it is a *new constitution,* though most of the provisions of the old constitution were embodied in it.

"Had the new constitution made no provision for the officers elected or appointed under the old constitution to continue in office, they would have been stripped of all official power at the very instant of time that the old constitution was repealed by the adoption of the new —the instrument which created their offices, and from which they derived all their right to exercise the powers appertaining to them, being abrogated—in other words, their *commission,* as it is called by the Virginia judge, being revoked by the fiat of the people who granted it—they could not have held their offices for another moment, or legally discharged a single duty attached to them."

In *State ex rel. Anderson* v. *Erickson et al.,* 180 Minn. 246, 230 N. W. 637, 638, the court was considering the eligibility of a member of the legislature to the office of County Commissioner. The legislature passed an act fixing the salaries of county commissioners according to a population schedule. It so happened that the salary of county commissioner in Hennepin County was thus increased $600. A member of the legislature sought the post of county commissioner. The court said:

"The duties of county commissioners in Minnesota are such as to make them officers 'under the state.' All else aside, the plain purpose of the constitutional prohibition would be thwarted in proportion as we denied its effect upon any such officers, the creation of whose official place or the fixing or increasing of whose salaries or other emoluments are within the power of the Legislature. The purpose was to protect the taxpayers from the working of selfish interest in the creation of public place and the fixing of compensation for public service. Local taxpayers are as much entitled to that protection as those of the state at large, and the plain purpose of the Constitution is to extend it to them."

The South Dakota court extensively discusses the principles involved in *Norbeck & Nicholson Co.* v. *State,* supra. That was a case involving a contract made by the state with a corporation in which a member of the legislature was a stockholder. An analogy is seen where the court discusses the contention that a difference exists between the case of an express and an implied contract. The present case is analogous in that it presents the difference in the creation of an office, and the implied creation of an office by legislative creation of a vacancy therein. The court there said:

"In *Berka* v. *Woodward,* 125 Cal. 119, 57 P. 777, 45 L. R. A. 420, 73 Am. St. Rep. 31, the court said: 'We can yield no assent to the contention that our laws apply only to express contracts. The statute itself is general in its terms. * * * The only difference between an express contract and an implied contract is that in the former all of the terms and conditions are expressed between the parties; and in the latter some one or more of the terms and conditions are implied by law from the conduct of the parties. * * * To say that implied contracts were not prohibited would be to destroy the purpose and efficiency of the laws, and leave the people at the mercy of careless or unscrupulous officers.' Also see *Milford* v. *Milford Water Co.,* 124. Pa. 610, 17 A. 185, 3 L. R. A. 122."

And in *Palmer* v. *State,* 11 S. D. 78, 75 N. W. 818, 819, it is said:

"The language of the constitution is plain. Its meaning cannot be mistaken. The purpose of the provision is apparent. *It is intended to preclude the possibility of any member deriving, directly or indirectly, any pecuniary benefit from legislation enacted by the legislature of which he is a member.* It is one of the most important of the many reforms attempted by the framers of our organic law." (Italics added.)

Discussing a similar constitutional provision the Supreme Court of Oklahoma in *Baskin* v. *State,* 107 Okl. 272, 232 P. 388, 390, 40 A. L. R. 941, said:

"It is true a person might honestly fulfill his duty as a member of the Legislature regarding the appropriations and emoluments of certain offices, without any idea of accepting an employment from that department, and after the Legislature adjourned be employed in that department; but such a construction would open the gates of the gov-

ernment, and *is a direct violation of the spirit and intent of the Constitution.* While it is true the compensation to the Legislature is small, and in most cases perhaps does not pay his actual expenses, but still the constitutional convention thought best to place safeguards around the interests of the state, and thus prevent practices which could so easily be abused." (Italics added.)

An interesting case is found in 3 S. D. 553, 54 N. W. 606, 607, *State ex rel. McGee* v. *Gardner.* There is some analogy between that case and the one under consideration. The court said:

"The object to be sought is the thought of the constitution makers in the use of this expression, not generally, nor in other parts of the same instrument, but in this particular provision; and, while the presumption is that they constantly used the same expression with the same meaning, yet such presumption is not conclusive. In case of doubt between different constructions claimed for a constitutional or statutory provision, or the meaning of a term, *it is always allowable to inquire what results would legitimately follow either, with a view of ascertaining, if possible, whether such consequences were contemplated or intended. Rhodes* v. *Weldy,* [46 Ohio St. 234], 20 N. E. 461, [15 Am. St. Rep. 584]; *Henry* v. *Trustees,* 48 Ohio St. 671, 30 N. E. 1122; Cooley, Const. Lim. 71."

In *Lillard* v. *Freestone County,* 23 Tex. Civ. App. 363, 57 S. W. 338, 340, plaintiff was a member of the twenty-fourth and the twenty-fifth legislatures of Texas. The twenty-fourth legislature passed an act relating to publication of delinquent tax lists. The twenty-fifth legislature amended the law but did not affect the rate or make substantial changes therein. The constitution provided that no member of the legislature could be interested, directly or indirectly, in any contract authorized by a law passed during his term. Plaintiff while a member of the twenty-fifth legislature was interested in a contract for publication of the delinquent tax list. We quote from the opinion of the court:

"Appellant insists that his term of office as a member of the 24th legislature had expired, and that the amendments to the law made by the 25th legislature did not materially change the pay for publishing the delinquent tax list, and hence the above provision of the constitu-

tion does not apply. We are not willing to admit the contention that, appellant's term of office having expired as a member of the 24th legislature, he thereby became authorized to contract with Freestone county, by virtue of a law passed by that legislature. We think it apparent that the intention of the above clause of the constitution was to absolutely prohibit any person from entering into a contract with the state or county authorized by a statute passed by a legislature of which such person was a member. Such being the case, the intention should be given effect. Cooley, Const. Law, p. 69; Story, Const. § 413; Rawle, Const. ch. 1, p. 31; Potter's Dwar. St. p. 659. We are of the opinion that the contract was prohibited by reason of the appellant having been a member of the 24th legislature. The law was amended and re-enacted as a whole by the 25th legislature. The fees for publishing the delinquent tax list were changed. It may be the change was slight, but, whether a change was made at all in this respect, we think the entire law, having been enacted as a whole, was 'passed,' within the meaning of article 3, § 18, of the constitution, and that under said section plaintiff could not make a valid contract with Freestone county, authorized by the provisions of said law."

Washington has a constitutional provision exactly like ours. In *State ex rel. French* v. *Clausen*, 107 Wash. 667, 182 P. 610, 612, the court had before it an act of the legislature creating an industrial code commission, and providing that the governor appoint five members to the commission, one of whom was to be a member of the senate and one a member of the house. In holding that membership on the commission was an office in the state, the court quoted from *McCulloch* v. *Maryland*, 4 Wheat. 316, 17 U. S. 316, 410, 4 L. Ed. 579:

"Such is the character of human language that no word conveys to the mind, in all situations, one single definite idea. * * * Almost all compositions contain words which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended."

In holding the members of the legislature ineligible the court says:

"Statutes are enacted by legislators of experience, or at least by persons of affairs, while in the enactment of a constitution the public are the legislators. Unless otherwise provided, precision may be ex-

acted in determining the meaning of the language of a statute, while generally, in the case of a Constitution, its provisions should be construed in the common and natural view, always the most important thing being to determine, if possible, what the real intention of the lawmakers was. Discussing the subject, this court, by Judge Dunbar, in the case of *State ex rel. Chamberlin* v. *Daniel*, 17 Wash. 111, 49 P. 243, quoted with approval as follows:

" ' "A Constitution," says Mr. Endlich in his Interpretation of Statutes, § 526, "is 'intended for the benefit of the people and must receive a liberal construction.' 'The principle of strict construction would frustrate important provisions in every newly constructed frame of government.' Such is the general rule, the keynote, as it were, of all interpretation of constitutional provisions, and is in harmony with the principles already discussed." '

"Section 13, art. 2, of the Constitution, does not prohibit a member of the Legislature during the term for which he was elected from being appointed or elected to office, generally, in the state. The preclusion extends only to any office which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected. Of course, the purpose of the rule is obvious. It is, as was stated in *Fyfe* v. *Kent County Clerk*, 149 Mich. 349, 112 N. W. 725, in construing a similar constitutional provision, as follows:

" 'The purpose of these provisions is "to preserve a pure public policy," or, as we said in *Ellis* v. *Lennon*, 86 Mich, 468, 49 N. W. 308, speaking through Justice McGrath, "to prevent officers from using their official position in the creation of offices for themselves or for the appointment of themselves to place." ' "

We refer again to *Chenoweth* v. *Chambers*, supra. In *Gibson* v. *Kay*, 68 Or. 589, 137 P. 864, the court was considering the constitutional ineligibility of McColloch to appointment as an assistant in the office of the corporation commissioner. McColloch was a member of the legislature which passed an act creating the office of corporation commissioner, and authorizing such commissioner to appoint necessary help to assist him in the performance of his duties. The commissioner appointed McColloch an assistant in his office. The court held that the positions held by assistants and clerks appointed by the commissioner were public offices; that although they were not mentioned in the act they were created by the legislature of which McColloch was a

member because *had it not been for the act of the legislature there would have been no opportunity or occasion for the appointments,* and therefore McColloch was ineligible and could not recover compensation for his service. From *State ex rel.* v. *Sutton,* 63 Minn. 147, 65 N. W. 262, 30 L. R. A. 630, 56 Am. St. Rep. 459, we quote:

"The clause relied upon by the attorney general to sustain his contention is article 4, § 9, of the constitution, and reads as follows: 'No senator or representative shall, during the time for which he is elected, hold any office under the authority of the United States or the state of Minnesota, except that of postmaster; and no senator or representative shall hold an office under the state, which had been created or the emoluments of which had been increased during the session of the legislature of which he was a member, until one year after the expiration of his term of office in the legislature.' In treating of constitutional provisions, we believe it is the general rule among courts to regard them as mandatory, and not to leave it to the will or pleasure of a legislature to obey or disregard them. * * * A constitution is intended to be framed in brief and precise language, and represents the will and wisdom of the constitutional convention, and that of the people who adopt it. It stands, not only as the will of the sovereign power, but as security for private rights, and as a barrier against legislative invasion. It has been well said that 'the constitution, which underlies and sustains the social structure of the state, must be beyond being shaken or affected by unnecessary construction, or by the refinements of legal reasoning.'

\* \* \* \*

"*Evidently, it was the intention of the framers of the constitution, by the language used, to prevent, so far as possible, trafficking in public offices,* and, so far as appropriate language, with definite and well-understood meaning, is concerned, they did so. But this clause is absolute in its express terms that no member of the legislature, during the time for which he was elected, shall hold any other office under the authority of the state of Minnesota. *Hence, whether a member holds an office either by trafficking for it, or by an appointment conferred upon him, without solicitation and without bargaining for it, he still comes within the constitutonal prohibition.* It is not merely a question of whether he obtained the office in an honorable manner, but the prohibition is so far-reaching as to prohibit its being held, no matter what the conditions are upon which it was obtained. * * *

"When their terms cease, the disability no longer exists, and during their terms, having no legislative power, the temptation to traffic

in official positions is wanting; and, when their terms expire, they stand upon equal footing with other citizens, so far as concerns their right to hold office." (Italics added.)

In *Kimble* v. *Bender*, 173 Md. 608, 196 A. 409, 415, the court in determining that a member of the legislature was not eligible to appointment as justice of the peace, had before it an act authorizing the governor to appoint nine additional justices of the peace. The court says:

"It is, therefore, true that the ancient office of justice of the peace has attained constitutional recognition, and, in a certain sense, *the office may be said to have been created by the Constitution*, with the powers delegated to the General Assembly to change the number of justices; to prescribe their jurisdictions, duties and compensation.

\*       \*       \*       \*

"*The legislation of 1936 made it the duty of the Governor to appoint nine additional justices of the peace at large for Allegany county*. These justices became constitutional officers since their appointment was referable to the mandate of the Constitution, and within its contemplation. The additional justices are commissioned officials, who are required to take an oath of office; and to give to the state a bond for the faithful performance of the duties and obligations of office. They enjoy a fixed term of office and are entitled to a prescribed compensation, and, in the discharge of their judicial function, exercise a part of the state's sovereign power." (Italics added.)

So too in the instant case, the legislative act of 1941 made it the duty of the Governor to appoint an entirely new industrial commission (three members instead of one), an appointment he could not have made otherwise, because there were not such offices to be filled by him. The Maryland Court goes on to say:

"All the requisites of a new office are met. Further, it is indisputable that these additional officers had no legal existence before the act, and that *they could not have severally come into official being except through the vivifying effect of the act*. The nine additional justices thus endowed with full magisterial jurisdiction, duties, and compensation, *must be logically held to enjoy an office which was created by the act within the meaning of the provision of the Constitution*.

"*The respondent participates in the legislation of which he, while his then senatorial term of office is not yet at an end, has become its beneficiary* in the office created and in its substantial emoluments. Thus the appeal at bar is a real illustration of what the clause was designed to prevent. In *Westernport* v. *Green,* 144 Md. 85, 88, 124 A. 403, 404, the court made this clear statement of the reason and purpose of the inhibition: 'In the discussion of a provision of the same nature in the Constitution of the United States it is said in *Story on the Constitution,* § 867. "The reason for excluding persons from offices who have been concerned in creating them or increasing their emoluments is to take away, as far as possible, any improper bias in the vote of the representative and to secure to the constituents some pledge of his disinterestedness."'" (Italics added.)

It is evident therefore that the constitutional provision was designed and intended to prevent any member of the legislature from being appointed to any office which is made available to his appointment, by the action of the legislature of which he is a member. It is due to the respondent that we should say distinctly that there is nothing in the record whereby anything dishonorable in obtaining this office can be imputed to him, or to the one appointing him. Undoubtedly he is holding this office under an erroneous view of the meaning of the constitutional provision above referred to, but nevertheless against its express prohibition. In conclusion we quote from *Kimble* v. *Bender,* supra:

"*The appointment of an ineligible person is a nullity,* except that the official acts of such a person are regarded as the acts of an officer de facto. So the official acts of the ineligible respondent, who has acted as a justice of the peace at large under a valid act but under an invalid appointment, are the acts of a de facto officer whose official acts, if otherwise lawful, and until the respondent's title is adjudged insufficient, are as valid and effectual, where they concern the public or the rights of third persons, as though he were an officer de jure. *State* v. *Fahey,* 108 Md. 533, 538, 539, 70 A. 218; *Koontz* v. *Burgess & Com'rs. of Hancock,* 64 Md. 134, 136, 20 A. 1039; *Izer* v. *State,* 77 Md. 110, 115, 26 A. 282; *Claude* v. *Wayson,* 118 Md. 477, 84 A. 562."

Let the writ of ouster issue.

MOFFAT, C. J., concurs.

PRATT, J., concurs in the result.

WOLFE, Justice (dissenting).

I dissent.

In the instant case there was no abolition of an office and the creation of a new office. *Hunziker* v. *Kent*, 111 N. J. L. 565, 567, 168 A. 825, 826; *Butler* v. *Pennsylvania*, 10 How. 402, 13 L. Ed. 472; *Prince* v. *Skillin*, 71 Me. 361, 36 Am. Rep. 325; *Malloy* v. *City of Chicago*, 369 Ill. 97, 15 N. E. 2d 861; *Groves* v. *Board of Education of Chicago*, 367 Ill. 91, 10 N. E. 2d 403; *People* v. *McCormick*, 261 Ill. 413, 103 N. E. 1053, Ann. Cas. 1915A, 338; *Visor* v. *Waters*, 320 Pa. 406, 182 A. 241; *State* v. *Wright*, 211 Ind. 41, 5 N. E. 2d 504; *Suermann* v. *Hadley*, 327 Pa. 190, 193 A. 645. There was continuity of office and continuity of functions attendant to the office. There was not a change in a single function—not even a change in name. Respondents admit this. In fact, the eligibility of Grover is founded on the proposition that no new office was "created" but that the office continued to exist and that only the term of the office was changed. I do not understand that the opinion of Mr. Justice LARSON holds otherwise in that respect. Mr. Justice LARSON concludes that provision reading:

"No member of the Legislature, during the term for which he was elected, shall be appointed or elected to any civil office of profit * * * which shall have been created," etc., should be read in effect as "No member of the Legislature during the term for which he was elected, shall be appointed or elected to any civil office of profit * * * *or any vacancy in any such civil office* which shall have been created," etc.

The italicized portion is interpolated by expanding the meaning of the word "created" to cover not only a new office but a vacancy in an existing office. An impressive argument is made for this construction and one which appeals very strongly from the standpoint of public policy. If the purpose of Section 7, Article VI, were to remove the risk of any

judgment on a bill being influenced by the extraneous consideration that the legislator might individually benefit by voting for the bill, it would appear that it was just as necessary to make ineligibility extend to a vacancy created as to a new office. It should be noted in this connection that vacancies occurring in the regular course furnish greater opportunity for the allurement of prospective appointments influencing the support of a bill, than do vacancies specially created by legislative acts. However, the latter tendency might have an unfortunate growth. But the Constitution did not by its language specify *vacancies created in an existing office*. Many, in fact I think practically all, of the excerpts contained in the main opinion are taken from opinions which dealt with cases where there was a new office created, or with constitutional provisions which prevented the governor from appointing or the people from electing a member of a legislature to *any* office during his legislative term. The provision was broader than the limited provision of our Constitution.

As pointed out by Mr. Justice McDONOUGH, the framers of our Constitution must have had before them the phraseology of most state constitutions as they then existed and with studied care confined ineligibility to an office created, and intended not to include a vacancy created.

When we interpolate vacancies created by the legislature in order to satisfy a seeming demand of public policy not covered by the literal words of the section we are confronted by the difficulty of knowing where to draw the line in the interpolated field. Should the member be ineligible for any vacancy which is traceable to a legislative act of the legislature of which he was a member, during his legislative term, however remote the connection? In the instant case the vacancy was not directly caused by legislative action. The governor was required to act. He could have withheld action. When he did act the final result would be considered as having its primary cause in the enactment. But even this is not certain, for it may be that at least as to executive offi-

cers the governor may himself have power to remove without cause as inherent in his appointive powers. Such was the holding in *Myers* v. *United States,* 272 U. S. 52, 47 S. Ct. 21, 71 L. Ed. 160. And if so, could it not then be said that the action by the governor in appointing, ostensibly under the act, may be considered in fact as having been done in the exercise of his power of removal, if it exists? If the vacancy is caused by the exercise of executive power independently of legislative action, I assume Grover would not have been ineligible even under the opinion of Mr. Justice LARSON. There are many other situations to be conceived of in which a vacancy occurs which may be indirectly due to legislative action. Let us suppose Grover's legislature had passed a law compelling every office holder to retire at sixty-five years of age and such had caused several vacancies throughout the commissions. Could a member of that same legislature be appointed? Situations entailing vacancies even more remotely connected with legislative actions come to the mind. Where should the line be drawn? Once having opened the door on the theory that it would be desirable from a standpoint of public policy to forbid legislators whose actions contributed to the creation of a vacancy from filling such vacancy, the problem of determining in more remote situations involving legislative cause and effect whether the pull of public policy should make the legislator ineligible will depend on judicial opinion rather than on statutory construction. I do not think we are warranted in expanding the idea of creation of offices to take in the idea of a creation of a vacancy in an office in view of the great likelihood that the framers were conscious of those very distinctions. They were hard-headed practical men and fully aware, by their general knowledge of governmental life and conduct and from the provisions of other constiutions which impliedly or expressly drew the distinctions, of the situation.

But granting the correctness of the construction of Section 7, Article VI, of the Constitution as laid down by Mr. Justice LARSON, it does not seem to me that the court has

given sufficient consideration to the status of Wiesley. The opinion appears to hold that the termination of the terms of the former incumbents could not take effect until there was an appointment and qualification of three new eligible members. Because this is a dissenting opinion, anything that I may say may only go so far as to indicate possible alternatives to the decision holding that neither Mr. Knerr, Mr. Wiesley nor Mr. Grover occupied under the amendment. Mr. Knerr of course occupied in any event as a holdover. In the first place I am not sure that the appointment of all three as a unit action in order to terminate the former incumbents' terms is required under the language of the act. While the language under the new Section 3, reads that

"the *terms* of office of the present members  *  *  *  shall terminate upon the appointment and qualification of the *three* members of the industrial commission,"

the Section could be construed to mean that the term of a present member shall terminate upon the appointment and qualification of a member under Section 3 to take *his* place, and that all the terms of the old members shall not be terminated until three new members are appointed and qualify under amended Section 42-1-1, Laws of Utah 1941. But it may be admitted that such construction might mix new terms and holdovers under the old act in such fashion as to destroy the scheme of staggering appointments; furthermore, that it would require both the amended section and the section before amendment to exist concurrently even after the amended section had become effectuated by action under it.

In consequence of what has above been said, the matter of Wiesley's status should therefore be examined on the theory that *none* of the terms of the old incumbents can be terminated until *all* three of the new terms brought into existence by Section 42-1-1, have been filled by qualified eligible appointees. What may be Wiesley's status under this view? Wiesley is a Republican. Mr. McShane the only Re-

publican on the commission was a holdover. Mr. Knerr and Mr. Grover are Democrats. Is not the view quite tenable that the Governor intended at all events to appoint Wiesley as the Republican member in place of McShane? It is true that he thought he was appointing Wiesley as well as Knerr and Grover under the force of the new Section 3 to terms set out in the amended Section 42-1-1. He appointed Wiesley to the four-year term, i. e. to March 1st, 1945, but have we not here a situation somewhat analogous to that in which a Section of a legislative act is declared unconstitutional. If the nullified section is severable and the paramount intent of the legislature to legislate in regard to the subject covered has not been so seriously interfered with as to be able to say that it would not have legislated at all in regard to the subject if it knew that its action as to the nullified section would fall, the remainder of the act must then be allowed to stand even though a saving clause is not included. In this case it would seem that at all events it was the paramount intent of the Governor to appoint Wiesley as the Republican member. If the terms of the old incumbents were still extant at the time of appointment and qualification—McShane's by hold over, the appointment of Wiesley plus the approval of the Senate might with tenability be considered as the Republican successor to McShane, at least for such interim period until amended Section 42-1-1 was really effectuated. If the law is as announced in *People* v. *Christian,* Wyo. March 10th, 1942, 123 P. 2d 368, that no vacancy occurs in an office by the mere coming about of the end of the period for which the incumbent is appointed where the law or constitution says such incumbent shall serve until his successor is elected and qualifies, then unless McShane can be considered as having abandoned his office by failing to appear to administer it or by non-user or to have created a vacancy by acquiescence. (*People* v. *Christian,* supra) it must be considered that there was no *vacancy* ripe for filling. But the holdover term of the Republican member was ripe for a successor who was properly appointed and quali-

fied. Conceding for this argument that *People* v. *Christian,* supra, is correct in holding that one cannot succeed a hold-over officer unless his appointment by the Governor is confirmed by the Senate—as an additional necessary act in terminating a holdover position as distinguished from the filling of a vacancy—such confirmation had taken place in Wiesley's case. Hence it seems to me that Wiesley stands in McShane's shoes as his successor until such time as the Governor shall appoint three eligible appointees under the new Section 3, to the terms set up in amended Section 42-1-1, and they qualify. The matter then stands as if McShane had continued, which he could do until his term had been properly terminated by action under new Section 3, except that Wiesley having been appointed as his successor and confirmed by the Senate, stands in his shoes also awaiting the result of a proper appointment and qualification of three eligible members under new Section 3. This of course assumes throughout the correctness of the proposition of Mr. Justice LARSON that unit action is necessary to effectuate new Section 3. It would be my view, therefore, that even under the theory of Mr. Justice LARSON we should ignore that part of the Governor's communication appointing Wiesley to the term ending March 1, 1945, and treat the action of the Governor as one appointing him to succeed McShane as the Republican member, which being confirmed by the Senate would so constitute him McShane's successor until new Section 3 was properly effectuated.

Of course under the view taken by Mr. Justice McDONOUGH and myself, Mr. Wiesley and Mr. Grover are properly in office under the amendment because we view it as having been already effectuated.

I do not know whether there can be de facto officer when a de jure officer already fills a position. But I do not think it necessary to decide that question now. The last paragraph of the opinion attempts to do so. I think it must be considered obiter. If the analysis above set out pertaining to Wiesley's status is correct, he is a de jure officer.

The constitutional aspects of amended Section 42-1-1, and new Section 3 have not in any of the opinions filed herewith been raised or considered.

For the reasons set out in this opinion and for the reasons given in the opinion of Mr. Justice McDONOUGH, I think the writ for the ouster must be denied.

McDONOUGH, Justice (dissenting).

I dissent.

The opinion poses the question: Was the position to which Grover was appointed an office created—within the meaning of the constitutional inhibition—by the legislature of which he was a member?

In answering such question in the affirmative the opinion holds:

(1) That "the purpose and intent of such constitutional provisions [as ours] are to insure that no member of the legislature during the period for which he was elected can profit or obtain any office by virtue of any enactments of the legislature of which he is a member."

(2) "Had it not been for the enactment [of 1941], for the law passed, by that legislature the office to which Grover has been appointed would not have existed as an office to be filled by appointment of the governor."

(3) Grover was a member of that legislature.

Hence, the appointment of Grover violated the purpose and intent of the constitutional provision in question.

It must be conceded that if the purpose and intent of Section 7, Article VI, is as comprehensive as stated in the opinion, then the conclusion reached is sound. Our inquiry then must be directed to whether the purpose and intent of our constitutional provision is accurately stated. I think it is not; hence, I am of the opinion that the decision, arguing logically from an erroneous premise, necessarily reaches a wrong conclusion.

Rather than, as stated by Mr. Justice LARSON, the intent of that part of Section 7, Article VI, with which we are

now concerned, was that therein literally expressed: To prohibit the appointment or election during the term for which he was elected, of a member of the legislature to any civil office of profit, which was created—i. e., brought into being—during such term. Its purpose—the reason for its adoption—was doubtless that given by Story as quoted on page 6 of the opinion of Mr. Justice LARSON [125 P. 2d 812], read in the light of its context:

"to take away as far as possible, any improper bias in the vote of the representative"

*where such vote has to do with the creation of an office.* That such is the intendment of the quotation is evident from the discussion by Justice Story, as to whether the provision is as comprehensive as it should be, in the paragraph next succeeding that from which the quotation is taken.

"It might well be deemed harsh," says the author, "to disqualify an individual from any office, clearly required by the exigencies of the country, simply because he had done his duty. And, on the other hand, the disqualification might operate upon many persons who might find their way into the national councils, as a strong inducement to postpone the *creation of necessary offices,* lest they should become victims of their high discharge of duty. The chances of receiving an appointment to a *new office* are not so many or so enticing as to bewilder many minds; and if they are, the aberrations from duty are so easily traced that they rarely or never escape the public reproaches. And if influence is to be exerted by the executive for improper purposes, it will be quite as easy, and in its operation less seen and less suspected, to give the stipulated patronage in another form, either of office or of profitable employment, *already existing.*" (Italics added.)

That the intent and purpose of the provision is as confined as I have indicated seems to me evident from the nature and scope of the problem of policy there dealt with, the words therein used, and the wealth of material upon which the drafters had to draw—the choices of policy which must have been presented to their minds—in dealing with such problem.

The problem to be dealt with was venality. Its dimensions were well known in 1895. It had theretofore often and variously manifested itself in public life. It was not the product of the machine age, the passing of frontiers, or social and industrial developments. It was and is the corrupt product of a quality of human nature confined to no age, class, or race—self interest.

In the drafting of a constitutional provision having to do with the problem in the limited field of eligibility of a member of the legislature to other offices in the state, the Constitutional Convention would doubtless, it appears to me, have attempted an exact definition of ineligibility. They were not dealing with a subject—as in the drafting of other provisions they doubtless were—which it would appear wise to deliberately leave open to the hazards of interpretation. The subject dealt with, as I have heretofore pointed out, and the words used in the provision are such as to evidence that Section 7, Article VI, is not a constitutional provision which may be conceived of as having an expanding meaning, devised that its application may meet changing conditions in the field with which it deals.

I do not understand that the opinion argues the contrary. The thought is nowhere therein suggested that because the practice of rewarding, by appointment to office, legislators who do as the executive bids has in recent years become an accepted one; the provision should be given an expanded meaning in order to preserve legislative independence. But if the words therein used mean today what they meant when written in 1895 and what they meant when written into the United States Constitution in 1789, their interpretation should not be a difficult task.

"The word 'create' means to cause to exist or to bring into existence something which did not exist." *State* v. *Gooding*, 22 Idaho 128, 124 P. 791, 792; *Mayor & Commissioners* v. *Green*, 144 Md. 85, 124 A. 403.

An office is something distinct from a vacancy in office; and the words "creation of an office" do not include within their meaning "creation of an office or a vacancy therein."

That it was not the intent of the framers of our Constitution to extend the ineligibility beyond that literally expressed is clear when we consider other evidences of that intent. They contemplated that the legislature would immediately create certain offices and from time to time as the need arose create others; and they provided that it should do so. The same phraseology is used in referring to such act as is used in Section 7, Article VI. Thus, in Section 10, Article VII, they speak of "officers whose offices are established by this Constitution, or which may be created by law." The last three quoted words can have no other meaning than that I have ascribed to those in the ineligibility provision. While I am aware that the same words used in different parts of an instrument may have different meanings because of their context, or other evidence of differing intent, there is no evidence in the context or otherwise that actual creation of office was not the concept which the words were used to express in the one provision as it was in the other.

Again, at the time of the adoption of our state Constitution there were in existence forty-four other state charters. Most of them had a provision dealing with ineligibility to other office of members of the legislature. They were of varying import. Some of them were identical to Section 7, Article VI. Others made the ineligibility very much broader. For example, Montana's charter (Article V, Sec. 7) extended the ineligibility to appointment or election to any civil officer under the state during the term for which the member was elected. North Dakota (Article II, Sec. 39) after using the identical language of our constitution goes on to provide

"nor shall any member receive any civil appointment from the governor, or governor and senate, during the term for which he shall have been elected."

Others made the ineligibility as to created offices extend only to appointment and not to election. A reading of the proceedings of the Constitutional Convention will reveal—

though it could well be assumed without doing so—that the provisions of other state charters were carefully considered and compared by the members appointed to draft provisions of our charter. They chose a provision which encompasses a smaller field of ineligibility than did many of those examined.

In speaking of a statutory provision of the same import as our constitutional provision, the Supreme Court of Idaho in *State* v. *Gooding*, supra, said:

"Disqualifications for holding office will not be extended to persons who do not come clearly within the scope of the statute or constitutional provision making such disqualification."

See, also, 46 C. J. 937. While the cases in support of the rule as stated in Corpus Juris deal with statutory provisions, I know of no reason why it should not be applied in construing the constitutional one here in question.

A practice was prevented by the use of the words employed literally construed which if not prevented would work much more detrimentally to the people of the state than would any practice not prevented unless the meaning of the words under discussion be expanded. It was this: In proposals before the legislature for the creation of offices, in the determination of whether public moneys should be expended for a proposed expansion of governmental activity, or whether the sovereign power should interpose itself in certain affairs of the citizens, the members of the legislative body should not have their judgment influenced in matters of such great concern by anticipated benefits which might flow to them by the very act of creation. Thus venality to this extent would be curbed.

The constitutional provisions of several of the states from the opinion of whose courts quotation is made in the opinion of Mr. Justice LARSON relative to the purpose and effect of such provision, contain much more comprehensive language than that under examination. This is pointed out in the opinion as to several of such jurisdictions. It is true also of

South Dakota, Oklahoma, and Minnesota. The South Dakota constitutional provision (Article III, Sec. 12) discussed in *Palmer* v. *State*, 11 S. D. 78, 75 N. W. 818, from which quotation is made in the opinion of Justice LARSON is of the same import as that of North Dakota set out above—as is that of Oklahoma, the asserted purpose of which provision is contained in the quotation from *Baskin* v. *State*, 107 Okl. 272, 232 P. 388, 40 A. L. R. 941. See Article V, Sec. 27, Constitution of Oklahoma. The Constitution of Minnesota (Article IV, Sec. 9) provides that no member of the legislature shall hold any office under the state during his term, nor, where the office has been created during a session of which he is a member, for one year after the end of his term.

In considering the excerpts from California cases contained in the opinion of Justice LARSON which speak of the purpose of the act as amended in 1916 a reading of the early case of *People ex rel. McCoppin* v. *Burns*, 53 Cal. 660, is instructive as to the intent of the unamended act. It appears from the opinion and an examination of the statutes referred to therein that the Board of State Harbor Commissioners consisting of three members were, under the act approved March 5, 1864 (Statutes of California 1863-64, Chap. CLXIX, p. 138), creating the office, elected: One by the people of the state at large, one by the electors of the City and County of San Francisco, and one by the members of the Senate and the Assembly.

By an act approved February 28, 1876 (see Amendment to the Codes 1875-76, Chap. CIV, p. 32) the appointment of such commissioners was vested in the governor with the consent of the senate.

Relator was a Senator at the time of the passage of the last-mentioned act. He was, by the Governor, appointed Harbor Commissioner before the expiration of his legislative term. Relator was held not to be ineligible to appointment thereto under Sec. 20, Article 4 of the California Constitution, which, in so far as appointive offices are concerned, was identical with Sec. 7 of Article VI of our constitution.

The court apparently adopted the view of relator printed in the report, viz.:

"The Act of February 28th, 1876, only changed the method of filling, and remodeled the duties and functions of the office—*it existed all the time.* * * * The office does not come within the letter or spirit of the constitutional inhibition." (Italics added.)

The language used in the cases referred to should not impel us to assume such purpose or intent under the provision of our charter. Rather we should glean its intent from the words used in the absence of other constitutional provisions which might modify them or other compelling evidence that they mean more than they literally say. With respect to cases cited in the main opinion from jurisdictions other than those just referred to as having different constitutional provisions from our own, they are, for the most part, readily distinguishable. In the case of *State* v. *Clausen,* 107 Wash. 667, 182 P. 610, the statute actually brought into existence the industrial code commission, appointment to which commission, the court held, could not be made from the legislature. In *Gibson* v. *Kay,* 68 Or. 589, 137 P. 864, a member of the legislature was prohibited from being appointed to the office of assistant to the corporation commissioner when the latter office was created by the legislature of which the appointee was a member. In *Kimble* v. *Bender,* 173 Md. 608, 196 A. 409, the office of justice of the peace was already in existence, but the legislature increased the number of such justices. The court held that increasing the number of officers for justices of the peace was the same as the creation of a new office.

While I can give personal assent to everything which is said in the forceful opinion of Mr. Justice LARSON, which argues that as a matter of policy the constitutional provision discussed should be broader than its literal meaning, that expansion should in my opinion be effected by amendment rather than by construction.

Because I am of the opinion that the construction of Section 7, Article VI, given in the main opinion, is beyond its expression and its intendment, and that the appointment of respondent Grover was valid, I am of the opinion that the prayer for a writ of ouster should be denied.