' PER CURIAM. ‘
In original mandamus proceedings filed in this court, we are required to determine the-effect of Section 5 of. Article III .of the -Constitution, F.S.A., of this-¡state on the.eligibility of the Honorable Charley,E. Johns to become a candidate for -the- ¡office of Governor to.fill the unexpired .term of the late Governor Dan McCarty.- Senator Johns has announced his candidacy for the. Democratic nomination for governor and .has qualified with the'Secretary of State, a respondent here^for such office. The relator seeks to compel the respondent to expunge from his records all matters pertaining to Senator -Johns’ candidacy. We exercised our discretion in favor of granting the alternative writ in view of the. great public interest in the question presented, and the cause is now before the court on motion of the respondent to quash the alternative writ.
The section of the Constitution involved in the present, controversy provides that “no Senator or ■ member.. of the House of Representatives shall during the time for which hé wás elected^ be appointed, or elected to any civil office under the Constitution of this State that has been created, or the emoluments, whereof shall have been increased during such time.” Section 5, Article III, Constitution of Florida.
.Senator Johns was elected to the Senate at the general election in November: 1952 for a ..four-year term, so. that. his. term of office as Senator will; not expire.until the general.election in ,1956. The, General Ap^ propriations - Bill, of 1953, Chapter 28115, F-S.A. § 282.01, subd. 1(22), carried an appropriation of .$15,000 for the .salary of the Governor for the biennium ending June 30; -1955.. This -was an- increase of. $3,000 per.year oyer the statutory-salary, of, $12,-000 per year -fixed by Chapter 22913, Laws of Florida, Acts of 1945, .for this, office.. ,.
■ The only real question involved in this proceeding is whether the 1953 Appropriations Bill, which provided for an increase in the salary of,.the office of Governor in the manner noted above, and which, by its own limitation, expires in what would have been approximately the middle of the four-year term of the late Governor McCatty, had' he lived, constituted an increase in the emoluments of the office of 'Governor, within the purview of - Section 5 of Article III, supra.' ....
It is a firmly-settled principle of law that in “construing and applying provisions of a Constitution,, the leading purpose • should be to ascertain and effectuate the intent and the object designed to be accomplished.” Mugge v. Warnell, 58 Fla. 318, 50 So. 645, 646; State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 So. 739, 37 A.L.R. 1298. And the intention to be ascertained must'be that of the framers and the people adopting it, for that intention is the “spirit” of the Constitution. Amos v. Mathews, 99 Fla. 1, 126 So. 308; Sullivan v. City of Tampa, 101 Fla. 298, 134 So. 211; City of Jacksonville v. Continental Can Co., 113 Fla. 168, 151 So. 488; State v. City of Miami, 113 Fla. 280, 152 So. 6; City of Tampa v. Tampa Shipbuilding & Engineering Co., 136 Fla. 216, 186 So. 411; State ex *473 rel. McKay v. Keller, 140 Fla. 346, 191 So. 542; Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892; Story on the Constitution, 5th Ed., Section 400.
In determining intent and purpose of a constitutional provision the courts “should constantly keep in mind fhe object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied. Effect should be given to the purpose indicated by a fair interpretation of the language used [but the] intent may be shown by implications as well as by express provisions.” 16 C.J.S., Constitutional Law, § 16, pp. 51-54. Amos v. Mathews, supra; Getzen v. Sumter County, 89 Fla. 45, 103 So. 104; State v. Greer, supra; State ex rel. McKay v. Keller, supra; In re Warner’s Estate, 160 Fla. 460, 35 So.2d 296.
The first and fundamental rule in the interpretation of a constitution .is to construe it according to the sense of the terms and the intention of the framers of such constitution and the people who adopted it. Where the words are plain and clear and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation. But where there is some ambiguity or doubt arising from other sources then interpretation has its proper office. “There may be obscurity as to the meaning, from the doubtfúl cháracter of the words used, from other' clauses in the same instrument, or from an incongruity or re-pugnancy between the words and the apparent intention derived from the whole structure of the instrument or its avowed object. In all such cases interpretation becomes indispensable.” Story on the Constitution, 4th Ed., Vol. I, Secs.' 400, 401, pp. 305, 306.
Where the words of a constitution, although they express the intention, when they are rightly understood, are themselves of doubtful meaning, recourse must be had to probable or rational conjectures to find out in what sense such words are used. When the words in a constitution admit of two -or more senses, each of' which is ¡agreeable to common usage, the sense in which they were intended to be used must be collected' partly from the -words and partly from conjecture as to their intention. In short, the words must be construed “according to the subject matter, in such a sense as to produce a reasonable effect, and with reference to the circumstances of the particular transaction.” Ibid., Sec. 402, p. 306.
To accomplish this object, light may be obtained “from contemporary facts or expositions ; from antecedent mischiefs, from known liabits, manners, and institutions; and from-other sources almost innumerable, which may justly affect the .judgment in drawing a fit conclusion in the particular ca:se.” Ibid.
“Where the words admit of two senses, each of which is conformable to common usage, that sense is to be adopted which,, without departing from the literal import of the words, best harmonizes with the .nature and objects, the scope and design, of the instrument.” Ibid., Sec. 404, p. 308. -
All of the authorities;are in-agreement that such a provision as is involved in this proceeding is inserted in a constitution for the purpose of taking from a senator or a representative “any personal motive which might operate upon him to create a new office or increase the emoluments of any office, new qr old.” Tucker on the ¡Constitution, Vol. I, p. 442. As the matter, is stated by Mr. Justice Story, “The reasons -f.or excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness.” Story on the Constitution, 5th Ed.,' Vol. I, section 867, p. 633. (Emphasis supplied.)
Our own court, speaking through Mr. Justice Terrell in State ex rel. Hawthorne v. Wiseheart, 158 Fla. 267, 28 So.2d 589, 592, has aptly stated that the purpose is *474 “to remove the temptation on the part of the Legislature or any of its members to ‘featherbed’ on the public domain during the period of their election, by raising the salary of or creating public offices and getting themselves appointed thereto.”
The expressions of other courts of last resort are also illuminating on the question of the purpose of similar constitutional provisions. Thus, the Mississippi court, in Brady v. West, 50 Miss. 68, says: “This is a wise provision of the constitution, designed as far as possible to preserve the purity of legislation, by putting the sting of disability into the temptation of members of the legislature to create offices of profit with a view to taking and holding them themselves.” And the Alabama court, in Montgomery v. State ex rel. Enslen, 107 Ala. 372, 18 So. 157, said: “The evident intention of the framers of the Constitution was to prohibit the legislature from creating offices, or increasing the salary of officers for the possible benefit of any members thereof, and thereby to remove the temptation of prostituting their positions for private gain or preferment.” From the Maryland court, in Mayor & Com’rs of Westernport v. Green, 144 Md. 85, 124 A. 403, 404, we have this expression: “It was the obvious intent of the Constitutional provision we have quoted to protect the members of the Legislature from the influence, upon their judgment and conduct, of any personal interest in the creation of new offices or the increase of the salaries or emoluments of any offices * * *. ‘It will prohibit any person, being a member of either branch of the General Assembly, from legislating * * * m order that he may be benefited by it’ ”, (Emphasis supplied.)
The delegates to the Constitutional Contention of 1885, at which our present constitution was adopted, were quite as well aware then, as we are now, of the problems and temptations which beset our legislators. “The problem to be dealt with was venality. Its dimensions were well known in 1895. It had theretofore often and variously manifested itself in public life. It was not the product of the machine age, the passing of frontiers, or social and industrial developments. It was and is the corrupt product of a quality of human nature confined to no age, class, or race — self interest.” State ex rel. Jugler v. Grover, 102 Utah 41, 125 P.2d 807, at page 822. The authors of our constitution sought to meet this problem by the enactment of the organic provision here involved, as did the framers of the constitutions of 25 other states and the Constitution of the United States. It is noteworthy, however, that only sixteen apply the organic inhibition to elective as well as appointive offices, as does the Florida constitution. The inhibition of the United States Constitution, art I, § 6, Clause 2, extends only to appointive offices. The Florida Constitutions of 1838, art. 6, § 9, 1861, art. 6, § 6, and 1865, art. 6, § 6, expressly excepted from the organic provision “such offices as may be filled by elections by the people.” The Constitution of 1868 omitted entirely the organic provision in question.
Why, then, did the framers of our Constitution of 1885 decide to include elective as well as appointive offices within the constitutional inhibition? The minutes of the Constitutional Convention at which it was adopted do not record the discussion which resulted in its adoption in its present form —that is, as applicable to elective as well as to appointive offices. But it is known that, at that time, the people were just emerging from the reconstruction period following the War Between the States; they still bore the scars of the Carpetbag Rule; the memories of the political abuses suffered thereunder were still fresh in their minds; and we can well surmise that they intended to prohibit the “trafficking” in public offices, both elective and appointive, from which they had suffered during that regime.
Public conditions are vastly different today. Many of the offices which were appointive under the original Constitution of 1885 have now, by amendment thereto, been made elective. With the free dissemination of news and the close coverage given the legislative deliberations by press and radio, the people are much better informed *475 concerning the actions of their legislators than they were in 1885, and they can express their approval or disapproval of such actions at the polls. We have no doubt that, as to elective offices, Section 5 of Article III was calculated to, and did, serve a useful purpose in the early days of this state’s history; indeed, it still does, within the reasonable limits and for the plain purposes for which it was enacted. But what was then thought to be a shield can, if so strictly interpreted as to enlarge it beyond its purpose, become a sword — a weapon which might easily eliminate capable men from offering for public office, and, in the words of Mr. Justice Story, present “a strong inducement to postpone the creation of necessary offices, lest [members of the legislative body] should become the victims of their high discharge of duty.” Story on the Constitution, 5th Ed., Sec. 868, p. 634.
In interpreting constitutional provisions of the type here in question, then, the courts must give a reasonable and commonsense construction to terms used in the light of their relation to the factual situations presented; and such provisions must be “strictly construed to uphold the eligibility of the officer if it can be reasonably done.” State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, 904. Such provisions must be interpreted in such a manner as to carry out the intention of the framers of the constitution and of the people in adopting it, and not to defeat it. For, as stated in a Kentucky decision construing a constitutional provision similar to that here in question, “Words are but imperfect vehicles designed to convey thought and in gathering the thought intended to be conveyed the purpose behind the words should be kept in mind. The Constitution is concerned with substance and not with form and its framers did not intend to forbid a common-sense application of its provisions." Meredith v. Kauffman, 293 Ky. 395, 169 S.W.2d 37, 38. (Emphasis supplied.)
In the case of Meredith v. Kauffman, supra, it appears that a public office was created during a session of the Kentucky legislature of which Kauffman was a member but prior to the time that he was sworn in as such legislator. In refusing to declare Kauffman ineligible to hold the office thus created, the court declared: “Considering the provision in the light of the purpose it was intended to accomplish, it is apparent that it does not render appellee ineligible to the office to which he was appointed. The Act creating the office was passed, enrolled and signed before he was elected to the General Assembly. True, it did not become effective as a law until after his election but the word ‘created’ in the constitutional provision should be construed to have reference in point of time only to the termination of legislative action necessary to creation and not to a future date on which the legislative action becomes effective through operation of law.”
The reasonable and common-sense legal approach to the question involved is also illustrated in Mayor & Com’rs of Westernport v. Green, 144 Md. 85, 124 A. 403. Here, one Peters was a member of the General Assembly which passed an Act providing that the Town Clerk of Westernport should be. chosen by the mayor and commissioners and that such officers should prescribe the “rate of compensation” for the position. During Peters’ term in the General Assembly, the mayor and commissioners increased the salary of Town Clerk and appointed Peters to the office. The court held that there had not been an increase in the emoluments of the office during Peters’ term as a legislator, within the meaning of a constitutional provision similar to ours. “The ineligibility to which the Constitution refers in the section cited, was evidently designed to be produced only by action in which the legislators to be affected by the provision could have participated”, said the court.
And in State ex rel. Todd v. Reeves, 196 Wash. 145, 82 P.2d 173, 175, 118 A.L.R. 177, it was held that an Act establishing a retirement system for Supreme Court justices— although admittedly adding to the desirability of the office — was not an increase in the emoluments thereof within the organic in *476 hibition; that, as used- in the constitution,“emoluments” meant an actual pecuniary gain, rather than “some imponderable and contingent benefit”.
In the light of the above rules of construction and bearing in mind the-purpose of the organic provision -in question, - we come, then, to the consideration of the question whether under the facts involved in the instant case Senator Johns should be declared ineligible to hold the office of Governor, because of the provisions of Section 5 of Article III.
As has been noticed, the increase in the salary of the office of Governor was not a permanent fixed increase by statute; it was merely a temporary increase, by appropriation, for the biennium ending June 30, 1955, which by virtue of controlling law will automatically come to an end and the salary will revert to $12,000 on that date. Sections 14.04 and 111.01, Florida Statutes 1953, F.S.A. It was, from the point of view of the Legislature, a temporary increase in salary for the benefit of the incumbent then in office, and for, no one else.' At the time of the enactment of the Appropriations Bill, there was no reasonable ground for belief that, by circumstances beyond mortal control, the regular four-year term of Governor McCarty would be brought to an end by his untimely death; and there could not have 'been present in the mind of any member of the Legislature the remotest thought that by voting the increase for the benefit of the incumbent .such legislator would serve or promote any personal ambition he might have to bécótñe a candidate for the gubernatorial term beginning in January 1957. And even though the untimely death of Governor McCarty has necessitated an election for Governor two years in advance of the time at which it would ordinarily be held, thereby bringing Senator Johns and all other Senators whose terms of office do not expire until the general election in: 1956 within the ban of the constitutional inhibition (if the provision is given a restricted and tortured construction), it is inescapable ■ that no charge of bias'or self-interest could possibly be made ágainst any -such member, under the circumstances as they existed at the time the Legislature. voted for the 1953 General Appropriations Bill.
There is a‘clear distinction between the facts here present and those in the case of State ex rel. Fraser v. Gay, supra. There, the increase was a statutory increase which, so long as it remained unchanged by' another statute, was a fixed and permanent obligation of the state; here, the increase is only a temporary one which, by its very terms, will expire well in advance of what at.the time of its enactment was any foreseeable gubernatorial election. There, Senator Fraser had never faced the people in a primary election (he was the Democratic nominee by virtue of an appointment by the State Executive Committee of the Democratic Party), nor did he face the people of this state in a general election in the true sense of the word, as he had no opposition in the general election. Here, Senator Johns will have to run in the primary election against formidable opponents; his candidacy will, in truth and in fact, be submitted to the people. There, Senator Fraser aspired to the office' of Comptroller; here, the office involved is that of Governor. This court can take judicial notice of the fact that there is no legal disability against succeeding oneself in' the office of Comptroller, as there is in the case of a Governor who holds for a four-year term, and that an election to such an office as Comptroller is often tantamount to a life-time job if the incumbent desires to perform its duties and obligations for that length of time. Thus, the fact that the increase was by statute and was for such an office as Comptroller, assumes even greater importance. It is plain, therefore, that the facts in the instant case are clearly distinguishable from those in the case of State ex rel. Fraser v. Gay, supra.
From what has been said, it is clear that there could have been no temptation .on the part of Senator Johns or any other member of the 1953 Legislature “of prostituting their positions for private gain or preferment” in increasing the appropriation for the benefit of the incumbent; they could *477 not have been influenced by “any personal interest” in voting for such, increase; they had no “self interest” to serve in voting for it.
For the reasons stated, we are of the opinion that the .emoluments of the office of Governor have not been increased' by the action of the 1953 session of the Legislature, within the spirit,and intent of Section 5, Article III, Constitution of Florida, F.S.A., so that such section does not render Senator Johns ineligible for the office.
The views of the individual justices as reflected in the several opinions filed, have been jointly considered by the court. . The CHIEF JUSTICE and Justices TERRELL, THOMAS, SEBRING, HOBSON and DREW are of the view that the 1953 Legislature increased, the. salary of the Governor and the various other constitutional officers for the biennium ending June 30, 1955..
Justice MATHEWS is qf the' view that the Legislature did not increase such salary for the reasons, set forth in his opinion; that'even if the salary was increased, to $15,000 per annum, the action of the Budget Commission in attempting to reduce the salary to $12,000 was a nullity, and did not reduce the salary of the office; . that the case of Fraser v. Gay is controlling and the, so-called “Gomez Clause” had no effect upon the eligibility of Senator Johns; that the attempted increase in emoluments of the office of Governor failed, and that Senator Charley E. Johns is therefore eligible for the office of Governor which he now seeks by election. .
The CHIEF JUSTICE and Justices SE-BRING, HOBSON and DREW'are of the opinion that the temporary increase, by appropriation, in the .salary of Governor for a two-year period only, is not sufficient to render Senator Charley E. Johns ineligible for the office of - .Governor now • being sought by .him. Their individual reasons for so holding are set forth in this Per Curiam opinion and in .the.ir respective opinions.
, Justices TERRELL and THOMAS are of the view that the' increase in emoluments contained in the 1.953 Appropriations Bill was sufficient to render Senator Johns ineligible for the, reasons set forth in the opinion by Justice TERRELL in which Justice THOMAS- concurs.
The majority of the’ court being of the view that Senator Johns is eligible for the office of Governor f.or the two-year term beginning in January 1955, the Alternative Writ should be and it is hereby quashed and the cause dismissed.
ROBERTS, C. J., and SEBRING, J., concur.
LIOBSON and DREW, JJ., concur specially. ...
MATHEWS, J., concurs i-n' judgment and dissents to opinion.
TERRELL and THOMAS, JJ., dissent.