395 P.2d 829

**Dan B. SHIELDS, Plaintiff,**

**v.**

**Lamont F. TORONTO, Secretary of State of the State of Utah, Defendant.**

**No. 10202.**

Supreme Court of Utah.

Oct. 15, 1964.

Bryce E. Roe, Salt Lake City, for plaintiff.

A. Pratt Kesler, Atty. Gen., Salt Lake City, for defendant.

CROCKETT, Justice.

On July 30, 1964, the plaintiff filed in this court a complaint challenging the right of Ernest H. Dean, Democratic candidate for Governor; and of G. Douglas Taylor, Republican, and Clyde L. Miller, Democrat, candidates for Secretary of State, to run to become the nominees for those offices for their respective parties in the primary election to be held on August 11, 1964.

In view of the urgency of time, the matter was set specially for hearing on Monday, August 3, when the court heard oral arguments and received written memoranda of counsel on both sides; and on August 4, decided the case by minute entry, dismissing the complaint and allowing the candidates to run for the offices above stated.

In the primary election, Mr. Dean was eliminated as a candidate for the governorship, but Mr. Taylor and Mr. Miller were successful in gaining the nomination for Secretary of State for their respective parties.

The basis of the complaint is that these candidates had all been members of the 1963 legislature which had enacted a general salary increase bill which had raised the salaries of all state officers including those of governor and secretary of state.[1] It is contended that they were therefore rendered ineligible to seek these offices because of the provisions of Section 7, Article VI of our Constitution which provides:

"No member of the Legislature, during the term for which he was elected, shall be appointed or elected to any civil office of profit under this State, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected."

1. S.L.U.1963, ch. 173, pp. 577–79, codified as Sections 67–8–11 to 67–8–13, U.C.A.1953.

■ If this single provision stated all of the law and covered all of the rights of all of the persons affected, the answer to the problem we confront would be simple enough. But such is not the case. It is obviously not possible to state all of the law necessary to assure a well-ordered society in any such single prohibitory provision. For this reason it cannot properly be regarded as something isolated and absolute but must be considered in the light of its background and the purpose it was designed to serve;[2] and in relation to other fundamental rights of citizens set forth in the entire Constitution which are essential to the proper functioning of our democratic form of government. One of the principal merits of our system of law and justice is that it does not function by casting reason aside and clinging slavishly to a literal application of one single provision of law to the exclusion of all others.[3] Its policy is rather to follow the path of reason in order to avoid arbitrary and unjust results and to give recognition in the highest possible degree to all of the rights assured by all of the Constitutional provisions.[4]

■ The obvious purpose of Section 7, Article (VI) quoted above, was to guard against dishonesty or improper connivance by or with legislators and to prevent them from being influenced by ulterior schemes to enrich themselves at the expense of the public treasury by creating or increasing the pay of a public office and then taking advantage of it.[5] This purpose is altogether salutary. Let it be said with the greatest of emphasis that the provision referred to should neither be ignored nor evaded, but whenever there is even a remote possibility that the evil it was designed to prevent might exist, it should be applied in such manner as to accomplish its objective.[6] However, when adequate safeguards in that respect are observed, there appears to be no good reason to carry this provision beyond that purpose and make an unreasoning application of it where no such evil, nor any

2. Gammon v. Federated Milk Producers Ass'n., Inc., 12 Utah 2d 189, 364 P.2d 417–18 (1961); General Electric Co. v. Thrifty Sales, 5 Utah 2d 326, 301 P.2d 741, 746 (1956); University of Utah v. Bd. of Examiners of State, 4 Utah 2d 408, 295 P.2d 348, 361 (1956).

3. See Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400, 407 (1955); See also Erwin Griswold, "Absolute Is in the Dark", 8 Utah L.Rev. 167 (1963).

4. General Electric Co. v. Thrifty Sales, supra note 1; University of Utah v. Bd. of Examiners of State, supra note 1; State ex rel. Salt Lake City v. Eldridge, 27 Utah 477, 76 P. 337, 339 (1904); see McCormick v. Board of Education, 58 N. M. 648, 274 P.2d 299, 307 (1954).

5. For an exhaustive analysis of Art. VI, Sec. 7 and similar provisions in other constitutions, as applied to the *appointment* of a legislator to a *newly created* office, see State ex rel. Jugler v. Grover, 102 Utah 41, 125 P.2d 807 (1942).

6. See cases cited in State ex rel. Jugler v. Grover, ibid.; cf., in general, 67 C.J.S. Officers § 21, pp. 130–133 (collecting cases); Anno., 118 A.L.R. 182-194.

possibility of it exists. This would work injustice by depriving citizens of their basic rights and would also tend to disrupt the orderly processes of democratic government.

Turning to the particulars of the provision under discussion, it will be noted that the prohibition is to an office which "shall have been *created*, or the emoluments of which shall have been *increased*" during the legislator's term. The emphasized words so used together give character to each other.[7] in that light they seem to indicate plainly the setting up of some specific situation in state government by the *creation* of some office or so *increasing* a salary as to fit into some ulterior scheme whereby the legislator could improperly enrich himself at the expense of the public treasury.[8]

The important fact here is that the salary increases involved could not by any stretch of the imagination be regarded as partaking of the impropriety just referred to. There are two significant points which emphasize the correctness of this conclusion. In the first place, the raises given were not directed toward the creation of, nor to the in-

crease of emoluments of any particular office, but were part of a general salary overhaul covering 74 executive officers and judges of the state. These salaries had previously been set at various times and in various sections of our statutes. The 1963 Act referred to was not primarily a salary increase bill, but its main purpose was to repeal all of the separate acts[9] and to consolidate in one act the salaries of all of those offices in order to classify and bring about some uniformity and correlation among them. And second, the comparatively small increases amounting to about 5% of the remuneration of the offices in question were merely incidental to the main purpose. The secretary of state was raised from $10,500 to $11,000. While the raise for the governor was somewhat more, from $13,200 to $15,000, when the furnished residence, maintenance and other perquisites of the office are considered, the raise was just about the same percentage-wise. These relatively small increases, of that character, should properly be regarded as just what they were, a moderate cost of living adjustment on an across-the-board basis in keeping with the steadily rising costs of living.[10] Accordingly, it can be

7. See Hatch v. Public Service Comm., 3 Utah 2d 7, 277 P.2d 809, 812 (1954).
8. See State ex rel. Jugler v. Grover, supra note 5.
9. The title of the bill states: "An Act Relating to Salaries of State Officers; Providing for Groupings of Officials for Salary Purposes; Establishing Salary Clas-

sifications and Policies; and Repealing [other laws fixing salaries for said officials].
10. Cf. State ex rel. Lyons v. Guy, 107 N.W.2d 211 (N.D.1961), in which the court held that adjustments in the traveling expense allotment and social security benefits of the office of governor

said with assurance that this is not a situation which would lend itself to any ulterior scheme by a legislator to set up a high paying sinecure to take advantage of which Section 7 of Article VI was designed to prevent. Nor is there any reasonable likelihood that such raises would have induced anyone to run for the offices in question who would not otherwise have done so. The fact that some members of the legislature aspired to the named offices is merely coincidental. This is so clear that we believe no fair-minded person would contend to the contrary. Indeed, to the credit of the plaintiff and his counsel, no contention has been made that there was any actual impropriety or ulterior purpose whatsoever in the conduct of these candidates.

The absence of any improper machinations being practiced here is rendered even plainer by the fact that all that has been done has had full exposure to public view, and that these candidates have had full exposure to the elective process. Months before this suit was filed they had announced their candidacies for office. They had to run before and obtain the approval of the conventions of their respective parties. They were obliged to run in the public primaries against formidable opponents; and must face candidates of the opposing party in the general election. All of this with the public fully aware of all of the circumstances so they are free to approve or disapprove what the candidates have done.[11]

So important that it cannot be ignored, but must be considered in the composite picture, is the effect the plaintiffs contended for application of this Constitutional provision would have upon the fundamental rights of citizens and upon the overall functioning of our democratic system of government. The foundation and structure which give it life depend upon participation of the citizenry in all aspects of its operation. On patriotic occasions we hear a great deal of oratory declaiming how precious is the right and how essential is the duty to vote for the candidate of one's choice. The emphasis is placed on the first clause—the right to vote;[12] and the second clause—for the candidate of one's choice,

---

by the legislature did not disqualify a legislator from running for governor.

11. State ex rel. Grigsby v. Ostroot, 75 S.D. 319, 326, 64 N.W.2d 62, 65 (1954); State v. Gray, 70 So.2d 471, 474 (Fla. 1954); see Anderson v. Martin, 206 F. Supp. 700, 705 (D.La.1962; dissenting opinion), U.S. Supreme Court reversed, holding in accord with dissenting opinion, that candidate could run, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964).

12. "[H]istory has seen a continuing expansion of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the essence of representative government. The Fifteenth, Seventeenth, Nineteenth, Twenty-third and Twenty-fourth Amendments to the Federal Constitution all involve expansions of the right of suffrage." Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523 (1964). The "legislative apportionment" cases have held that the Equal Protection Clause

is minimized or forgotten. Lost sight of is the fact that the two rights are correlative, and that to make the first meaningful, the second must also be assured. Furthermore, the natural corollary of the right to vote is the right to seek and to serve in public office.[13] Reflection on the matter will reveal that these rights are of vital importance both to individual citizens and to the public. That the framers of our Constitution so regarded them and that these rights are correlated to each other and part of the integral rights and privileges of citizenship is plainly apparent from its numerous references to "the right to vote and hold office" in the same context.[14]

of the Fourteenth Amendment protects "[a] citizen's right to a vote free of arbitrary impairment by state action * * *." Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962) See Reynolds v. Sims, W. M. C. A. v. Lomenzo, Maryland Committee v. Tawes, Davis v. Mann, Roman v. Sincock, and Lucas v. Colorado General Assembly, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, all decided this term of the Court. See also Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964).

13. Cf. Snowden v. Hughes, 321 U.S. 1, 7, 64 S.Ct. 397, 400, 88 L.Ed. 497 (1943). "The right to become a candidate for state office, *like the right to vote for the election of state officers,* * * * is a right or privilege of state citizenship * * *." (Emphasis added.)

The right to seek election to any office is open to all persons possessing the Constitutional or statutory qualifications. Bordwell v. Williams, 173 Cal. 283, 159 P. 869; nor can the right of voters be impaired, Earl v. Lewis, 28 Utah 116, 77 P. 235; nor can the right of voters be impaired to cast their ballots for whomsoever is qualified to be a candidate. See Re Callahan, 200 N.Y. 59, 93 N.E. 262 (1910); Dapper v. Smith, 138 Mich. 104, 101 N.W. 60 (1904).

The right to cast a write-in vote for the candidate of one's choice in elections for constitutional officers is a right guaranteed by state constitutions. See Ogden City v. Patterson, 122 Utah 389, 250 P.

2d 570, 574 (1952); Park v. Reeves, 40 Utah 47, 52, 119 P. 1034, 1036 (1911); Jackson v. Norris, 173 Md. 579, 195 A. 576, 586–587 (1937; citing cases.); Re Callahan, supra. Under Amend. XIX to U. S. Constitution allowing women to vote, state courts have included their right to hold elective office. See, e.g., Opinion of the Justices, 119 Me. 603, 113 A. 614 (1921); Opinion of Justices, 240 Mass. 601, 135 N.E. 173 (1922); Rose v. Sullivan, 56 Mont. 480, 185 P. 562 (1919); Opinion of Justices, 83 N.H. 589, 139 A. 180 (1927); Preston v. Roberts, 183 N.C. 62, 110 S.E. 586 (1922).

Similarly, either the Fifteenth Amendment, Neal v. Delaware, 103 U.S. 370, 389 (1880); Opinion of the Justices, 119 Me. 603, 113 A. 614 (1922), or the Fourteenth Amendment, Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964), prevent states barring Negro citizens from public office. Accord: McDonald v. Key, 224 F.2d 608 (10th Cir. 1955).

14. The phrase "to vote and hold office" is used in various provisions of the Utah Constitution: Sec. 1, Art. IV, provides that the right of citizens to "vote and hold office" shall not be denied or abridged on account of sex; Sec. 6, Art. IV states that certain persons, incompetent, or having forfeited civil rights, shall not be permitted "to vote at any election, or be eligible to hold office"; Sec. 7, of Art. IV, and Sec. 4, Art. I, both deal with not requiring property qualifications "to vote or hold office."

For the purpose of seeing these rights in clearer perspective, suppose this were a case initiated by some voter insisting upon his right to "vote for the candidate of his choice," or by these candidates, insisting that their rights as citizens to run for office are absolute regardless of any or all other provisions of law. They could so maintain with as much logic as the plaintiff asserts his position here. Yet, there is no question but that other provisions of law can and do limit the rights to vote and to hold office to those properly qualified. The fair and proper adjudication of those rights would have to be that the citizen could insist upon them unless for some good and sufficient reason he is actually not qualified to vote, or for the office he seeks, or he is guilty of some wrong which would justify deprivation of such rights. If he were deprived of the privilege without any such ground existing, he would be unjustly and arbitrarily deprived of a right and privilege of citizenship.[15]

The impracticality of the literal application urged by the plaintiff is emphasized by considering what would happen to the legislature itself. Since our Constitution was originally adopted, the people have twice amended it to allow the legislature to raise their own salaries; and have twice amended it making changes in regard to the fixing of salaries of other constitutional officers.[16] It must be assumed that these later amendments were made in an awareness of the existence of Section 7 Article (VI), with which we are concerned, and that these later amendments were intended to be effective and should not be nullified by a strict and unreasoning application

15. "A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution * * *." Baker v. Carr, 369 U.S. 186, 208, 82 S. Ct. 691, 705, 7 L.Ed.2d 663 (1962). "The equal protection clause of the Fourteenth Amendment forbids [such] . . . discrimination." Wesberry v. Sanders, .376 U.S. 1, 84 S.Ct. 526, 11 L. Ed.2d 481, 536 (1964, Clark, J., concurring in part and dissenting in part). In Sol Block & Griff v. Schwartz, 27 Utah 387, 396, 76 P. 22, 25 (1907), Justice Bartch stated that the equal protection clause of the Fourteenth Amendment prohibits "[a]n enactment * * * which deprives a person arbitrarily of * * * some part of his personal liberty * * *. The word 'liberty,' as thus employed in the Constitutions and understood in the United States, is a term of comprehensive scope. It embraces * * * civil, political, and personal rights * * *."

16. Art. VII, Sec. 20, fixing the compensation of the chief state executive officers, was amended Jan. 1, 1946, to delete provisions in original constitution which gave the legislature power to fix the salaries of only *certain named* state officers, including the governor and secretary of state, and allowed the legislature to fix salaries of *all* state officers. S.L.U. 1946, 1st Spec. Sess., p. 5. A 1950 amendment omitted reference in Sec. 7, Art. (VI), to the office of superintendent of public instruction, which office was made appointive rather than elective by an amendment to Art. VII, sec. 19. S. L.U.1949, p. 297.

of the prior existing section. However, if that section were so applied that the granting of a small, across-the-board salary increase to all state officers would render all legislators ineligible to accept any state office during their legislative terms, or when they raise their own pay, would render them ineligible even to succeed themselves, there would be a very serious if not insuperable impediment to the raising of such salaries and the orderly progression of state government operation. This but emphasizes the fact that no such literal application was contemplated, but the Section was intended to apply where there was at least some possibility of improper machinations in State government.

In the several cases which have come to our attention dealing with such a Constitutional provision and a generally similar fact situation where there was no indication of wrongful conduct, the courts have quite uniformly arrived at the fair and practical result of allowing the candidate to run even though he had been a member of the legislature which had provided some increase in income to the office he sought.[17]

In the case of State ex rel. Grigsby v. Ostroot,[18] where the Constitutional history was somewhat different but generally analogous to our own, the South Dakota Supreme Court reasoned along the lines above set forth: That if the provision were so strictly and literally applied it would prevent even the legislators who had raised their own salaries from succeeding themselves and stated:

"It is not reasonable to believe that it was intended that after giving the legislature power to fix the salary of its members it was further intended that by increasing the salary of its members * * * it thereby rendered every member of that legislature ineligible to seek re-election."

The court declared the candidate for governor eligible to seek the office primarily on the ground that the later Constitutional amendments were intended to be effective and not to be nullified by a rigid and unrealistic application of the prior existing Constitutional provision similar to our own.

This problem also has a bearing on another practical aspect of state government.

17. State ex rel. Grigsby v. Ostroot, 75 S.D. 319, 64 N.W.2d 62 (1954); State ex rel. West v. Gray, 70 So.2d 471, 74 So.2d 114 (Fla.1954); State v. Guy, 107 N.W.2d 211 (N.D.1961); Adams v. Mathews, 156 So.2d 515 (Fla.1963); Meredith v. Kauffman, 293 Ky. 395, 169 S.W.2d 37 (1943); Mayor & Com'rs of Westernport v. Green, 144 Md. 85, 124 A. 403 (1923); cf. State ex rel. Carroll v. Munro, 52 Wash.2d 522, 327 P.2d 729 (1958; concurring and dissenting opinions.); Cf. also Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), in which petitioner's motion for order to show cause why Supreme Court Justice Black, an appointee to the Court from the Senate, should be barred from serving as Supreme Court Justice was denied.
18. Supra Note 17.

Historically the legislature has served as a proving ground in which our citizens obtain experience in government service and the public learns of their qualifications for other public offices. Under the contended for literal application, this valuable part of the traditional processes of government would be greatly hampered. Beyond this, where men committed to public service were desiring to pursue such careers, a device would be available to political opponents, who might, by manipulating a modest or even an inconsequential pay raise through the legislature, prevent well-qualified persons from running for public office. And this could happen however innocent the individual affected may be and in spite of anything he could do, even though he might work and vote against any such increase in salary.

The foregoing discussion points up the danger in yielding to the temptation to adopt literal applications of a single proposition of law without regard to whether it will result in injustice and without giving due consideration to other rights that may be involved. But eagerness for easy solutions to complex problems often leads to error and injustice. More mature reflection dictates the propriety of weighing the claimed rights against all others that may be affected and seeking to balance and harmonize them in such way as to best serve the purpose of according fair and just treatment to all concerned.

The principle that rights cannot be regarded as isolated and absolute is rendered more clear by reflecting on some fundamental ones: The first declared right, to life itself, is limited by various conditions prescribed by other provisions of law, including the duty, under given circumstances, to give one's life for his country. Another good example is that of the oft vaunted freedom of speech. Neither is it absolute and uncontrolled. One may not with impunity make statements which constitute slander, or perjury, or treason. Nor does one have "the right to falsely yell fire in a crowded theater." [19] In fact the rights to all of the basic liberties are limited by the obligation to accord the same liberties to others. To recognize these limitations and to refuse to apply the letter of any one single provision of the law in a rigid and unreasoning way, where other important rights will be overridden, is neither to destroy the law, nor to ignore it. But this would tend to be the result from making the law an unthinking monster which goes blindly along working injustice and crushing individuals or their rights in its path. The true spirit of the law is best served and honored by considering and applying the whole Constitution to the situation con-

19. See statement by Justice Holmes in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

fronted in a reasonable way. This requires giving effect to the Constitutional provision under consideration only in accordance with its purpose, which avoids injustice by safeguarding all of the other rights involved, and keeps the balance necessary to the good order of society generally.

Upon the basis of our analysis of the total picture and for the reasons hereinabove set forth, we have drawn the following conclusions: That Section 7 of Article (VI) of our Constitution was intended to be applied to prevent any possibility of legislative connivance or impropriety of conduct, and not where, as here, there has been an overhaul and consolidation of salary statutes and an incidental relatively small increase in the salaries of state officials and where there is no possibility of such impropriety; that under the facts here, a literal and rigid application of that section beyond its purpose would have the inequitable and unjust effect of depriving these otherwise qualified candidates of their Constitutional rights to seek public office, and other citizens individually and the public collectively of their rights to vote for public officials of their choice; that such a course would also render it difficult for legislators to deal fairly and objectively with proposals for salary increases for public officials, including themselves, for fear of disqualifying their members for appointment or election to state offices, or to succeed themselves; that this would also tend to

eliminate the legislature as a proving ground for persons aspiring to other state offices; and might even become a device for connivance to prevent deserving and qualified persons from seeking other state offices.

On the other hand, if the Constitutional provision in question is not given a rigid and literal application to the situation here to which it was never intended to apply, the evil effects just recited are avoided. There is no groundless and unreasoning deprivation of rights of citizenship, but they are assured as they should be; and no injustice is done. This is accomplished without in any way sacrificing the purpose of the Constitutional provision and harmonizes with the general purpose of permitting the democratic processes of government to operate as was intended.

For the reasons herein set forth it is our opinion that under the particular facts here existing plaintiff has shown no sufficient reason to deprive these candidates of their Constitutional rights to run for public office and that the complaint should be dismissed. No costs awarded. All emphasis ours.

CALLISTER and WADE, JJ., concur.
McDONOUGH, J., concurs in the result.

HENRIOD, Chief Justice (dissenting). I respectfully dissent.

Our Constitution states in clear, unambiguous and unmistakably plain, simple English that no member of the legislature, during his term, may aspire to a public office, the emoluments of which are increased by a legislature in which he is a member.

If ever a case were arrived at by judicial and rhetorical prestidigitation, this is that case, which in substance and effect concludes that this Court may determine the eligibility of candidates for office; and that if the Constitution says otherwise,—junk the Constitution. It simply is a thesis to the effect that the judiciary may be quite oblivious to Constitutional sanction or interdiction. The portent of such a conclusion results in lacrimonious lament, in the light of our cherished concepts about separation of powers and reverence for Constitutional prerogatives or inhibitions. The disarming platitudes of the main opinion do not make our Constitution shine the more brightly, but without logic or satisfactory explanation, and by judicial fiat, dims it.

After this case, anyone should be eligible to run for anything if he violates the Constitution a little but not too much.

After this case, anyone who aspires to public office may be eligible to run if he simply throws his hat in the ring and spends some money which the main opinion seems to think he should not have to lose. This is not very comforting to the other fellow who really *is* eligible but may not have as much money to spend, but nonetheless loses whatever he spends.

After this case, a little increase in the emoluments of office will not affect one's eligibility, but a big increase apparently would. The Constitution does not say this, but says just the opposite. Nowhere in that erstwhile divinely inspired document can one find any language that deifies a 5% increase but damns a 50% raise. To reason that just a little "across-the-board" raise is not actually a raise at all not only strains one's credulity, but suggests that a little pregnancy conveniently but temporarily may be acceptable.

There is nothing in the Constitutional language that suggests any such arithmetic formula, and the court can produce no slide-rule, rubber or otherwise, that justifiably can say a 5% increase in salary is not an increase in emoluments of the office, but that a 50% increase would be. Such a conclusion makes one suspicion the gratuity of the main opinion that the judicial system "does not function by casting reason aside and clinging slavishly to a literal application of one single provision of law to the exclusion of all others." If the Constitution says one cannot be a candidate if he is a member of the legislature that increases the emoluments of the office he later seeks, there is no judicial yardstick that can justify the position that a little increase in emolument is nice, but a bigger

one,—how big?—is very naughty and should kill its beneficiary by virtue of arithmetic formulae.

The main opinion says the Constitutional provision is to protect against dishonest legislators. This is an inanity that is predicated on the assumption that a crooked legislator who seeks office hoping to enjoy a 5% increase in its emoluments, must not be condemned by this court, as a fact finder, but that the haloed one with character references addressed to this court, is immune from the Constitution and can aspire to any office he seeks. In my opinion, this is a non sequitur which this high court has neither the pleasure or luxury to indulge.

The Constitution does not exempt one where a 1% increase in emolument is involved, nor one with a 10% increase, nor a 100% increase, nor "an across-the-board" increase. It does not say it favors the "little" increase but not the "big" one. Yet this court says it does without resort to any lexicographal sense or meaning.

The main opinion's unwarranted statement that "The fact that some members of the legislature aspired to the named offices is merely coincidental," is so naive as to merit no analysis, discussion or attempt at answer. It is like saying that if one could have prevented the baby from drowning in the bathtub, its death would be "merely coincidental." In one fell swoop, the amazing pronouncement of the majority says the Constitution means nothing; that it is "merely coincidental," and that the candidate is eligible if morally he is in good standing,—otherwise not.

I have read the main opinion over and over and inescapably can conclude nothing else except to learn that the court in this case loves everyone, except those it does not love, and that the clear expressions in the Constitution cannot interfere with such a noble, paternalistic philosophy.