**Lynn A. JENKINS, Plaintiff and Appellant,**

v.

**Moroni L. JENSEN, State of Utah, Robert B. Hansen, Attorney General of Utah, David S. Monson, Secretary of State/Lt. Governor of Utah, Defendants and Respondents.**

No. 17240.

Supreme Court of Utah.

July 7, 1981.

Lynn A. Jenkins, pro se.

Kenneth W. Yeates, David L. Wilkinson, Salt Lake City, for defendants and respondents.

MAUGHAN, Chief Justice:

This is an appeal from a judgment dismissing the complaint of the plaintiff in which he sought to remove the name of defendant, Moroni L. Jensen, from the September 9, 1980, Primary Election ballot as a candidate for the Democratic nomination for the office of Lt. Governor/Secretary of State.

The defendant, Jensen,[1] was a member of the Utah Senate. His term of office commenced January 1, 1977, and ended December 31, 1980. In April 1980, Senator Jensen announced his intention to run for the office of Lt. Governor/Secretary of State and thereafter duly filed for that office. The plaintiff, Lynn A. Jenkins, was a Republican candidate for the Utah Senate in District 8 of Salt Lake County. Jenkins filed this action for a declaratory judgment that Senator Jensen was ineligible to hold the office of Lt. Governor/Secretary of State

---

1. Senator Moroni L. Jensen died November 8, 1980.

because his election to that office would violate Article VI, Section 7 of the Utah Constitution and he sought to have Senator Jensen's name removed from the Primary Election ballot.

Article VI, Section 7 provides:

"No member of the Legislature, during the term for which he was elected, shall be appointed or elected to any civil office of profit under this State, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected."

■ Plaintiff first challenges Senator Jensen's eligibility to run on the ground that during his present term of office the legislature has twice increased the salary of the Lt. Governor/Secretary of State. The first increase was enacted in 1977 and raised the salary from $22,500 to $26,000 annually. The second increase was enacted in February 1980 and raised the salary from $26,500 to $33,500 annually upon its effective date, January 1, 1981. The district court found that the current rate of inflation in this country was between 13 to 14 percent annually and that the increase was made in an attempt to meet such inflation. The court further found that the salaries of elected state officials in this State have lagged behind both the salaries provided to other state employees and the increases in price indices from which inflation rates are derived. Exhibits were introduced to support those findings showing that the two increases, although amounting to 52 percent of the 1977 salary, did little more than keep the salary abreast of inflation. The court concluded that the decision of this Court in 1964 in the case of *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829, was dispositive.

We agree with the conclusions of the district court. We pointed out in *Shields v. Toronto*[2] that the purpose of Section 7, Article VI was to prevent a legislator from conniving or participating in an ulterior scheme whereby a new office would be created by the legislature or the emoluments of an existing office increased, and then the legislator would be appointed or elected to

such office and improperly enrich himself at the expense of the public treasury. We held, however, that when the increase does not enrich the office holder but merely keeps him approximately even with inflation, the mischief the provision was meant to prevent would not occur. We stated:

"The important fact here is that the salary increases involved could not by any stretch of the imagination be regarded as partaking of the impropriety just referred to. . . . These relatively small increases . . . should properly be regarded as just what they were, a moderate cost of living adjustment on an across-the-board basis in keeping with the steadily rising costs of living. Accordingly, it can be said with assurance that this is not a situation which would lend itself to any ulterior scheme by a legislator to set up a high paying sinecure to take advantage of which Section 7 of Article VI was designed to prevent. . . ."

We hold that *Shields v. Toronto* is controlling here. While the increases in the salary in the instant case are much greater than in *Shields v. Toronto*, the current inflation rate is much greater than it was when that case was decided in 1965. The increases voted by the legislature during the past four years for the Lt. Governor/Secretary of State were given at the same time and in the approximate same percentages as increases for other members of the executive department, namely, Governor, Attorney General, Auditor and Treasurer. The office of Lt. Governor/Secretary of State was not singled out for any special treatment over and beyond that conferred upon other members of the executive department. The increases in both instances were less than increases recommended to the legislature by the Executive Compensation Commission, a citizen commission which studies and recommends to the legislature increases in salaries for members of the executive and judicial departments of this State. There is no hint or suggestion here that either Senator Jensen, or any

2. 16 Utah 2d 61, 64, 65; 395 P.2d 829 (1964).

other member of the legislature, during the past four years, has been a party to an ulterior scheme or connivance to single out this office for any special treatment with the objective in mind that Senator Jensen would seek the office in this year's election. We adhere to the reasoning employed by this Court in *Shields v. Toronto* and reaffirm the law as set forth therein.

■ Secondly, the plaintiff attacks Senator Jensen's eligibility because the legislature in 1979 adopted Senate Joint Resolution No. 7 which proposes to amend Article VII of the Utah Constitution to change the name of the office of Secretary of State to Lt. Governor. This proposal will appear on the ballot in the November 1980 General Election for the approval or disapproval of the voters of this State. Plaintiff argues that by adopting Senate Joint Resolution No. 7 the legislature, of which Senator Jensen was a member, created an office and that under Article VI, Section 7, Senator Jensen cannot be elected to that office.

We find that this contention of the plaintiff is also without merit. We believe that the prohibition in Section 7, Article VI was aimed at the statutory creation of an office. Here the legislature has simply, by resolution, placed before the voters the decision of whether the office of Secretary of State shall be changed in the Constitution to be the office of Lt. Governor. If any office is "created" the creation will come about by the vote of the people and not by the vote of the legislature. A legislative act placing before the voters the decision of whether a new administrative or executive office will be formed does not constitute "creation" of an office. *State v. Gooding,* 22 Idaho 128, 124 P. 791.

The judgment below is affirmed. Costs to respondent.

J. ROBERT BULLOCK and RONALD O. HYDE, District Judges, concur.

1. 16 Utah 2d 61, 395 P.2d 829 (1964).

CROCKETT and WILKINS, JJ., having disqualified themselves, do not participate herein, BULLOCK and HYDE, District Judges, sat.

HALL, Justice (concurring in result):

I concur in affirming the declaratory judgment of the trial court, but do so on entirely different grounds than as relied upon by the main opinion.

In *Shields v. Toronto,*[1] the Court focused only upon the economic significance of the term "emoluments" as contained in Article VI, Section 7, Constitution of Utah, as a basis for its holding. However, careful examination of the whole of that particular constitutional provision reveals that it is readily susceptible of an interpretation which favors a citizen-legislator's right, under the facts of this case, to seek other public office.

Although the framers of our Constitution clearly prohibited members of the Legislature from aspiring to certain other state offices, they also clearly tempered that prohibition by use of the key phrase "during the term for which he was elected." The full import of the constitutional provision is best observed when it is paraphrased as follows:

No member of the Legislature shall 1) be elected to any civil office of profit, 2) created, or 3) the emoluments of which shall have been increased, 4) *during the term for which he was elected.*

Applying the constitutional provision to the facts of the instant case, it readily appears that as to the office of Secretary of State to which Senator Jensen aspires *in the future,*[2] none of the four (4) prohibited events enumerated above have occurred *during his tenure of legislative office,* nor *can* they occur during such time. More specifically, as to his *election* to the office of Secretary of State, such is yet to be determined by the electorate, and should he become the successful candidate, his 4-year tenure as legislator will terminate in December, prior to his installation in office as Secretary of State the following January.

2. This opinion is written in context with the facts as they existed prior to the general election held in November, 1980.

In regard to the creation of a new office, certainly no new office has been created "during the term for which he was elected." The *present* office is that of Secretary of State and it is the only office he can seek. The Legislature has seen fit to *designate* the office as a hyphenated "Lieutenant Governor-Secretary of State," but that designation, as a new constitutional office, is to be presented to the electorate for approval on the November ballot. Hence, even if so approved by the electorate, no *new* office will be created "during the term for which he was elected," but shall be created thereafter, in January, 1981.

Should one venture the suggestion that Senator Jensen would be "elected" during his present term to the future office to which he aspires, reason, logic and realism militate against such a conclusion. Although a successful candidate may be deemed "elected" in November, he cannot take office until the first Monday in January next following,[3] and then only after taking and subscribing the oath of office.[4] It is only then that the "emoluments" of office begin, and such are for the ensuing year, not for any prior time.

There is a lack of specificity in the law as to the precise day on which an aspirant for office is "elected," but realistically it cannot be said that one is "elected" in November when his official *installation* is constitutionally deferred until the following January. Moreover, one's eligibility for installation to office may be challenged, which in turn could negate the November "election." A recent case in point is that of *Cannon v. Gardner*,[5] wherein the professional qualifications of the "elected" Salt Lake County Surveyor were challenged which resulted in many months' delay in his installation to office. Similar delays may be encountered in situations where an official vote "recount" discloses that an apparent winner in November was not in fact "elected."

3. Article IV, Section 9, Constitution of Utah.

4. Article IV, Section 10, Constitution of Utah.

**STEWART, Justice (concurring in result):**

Plaintiff contends that Article VI, Section 7 of the Utah Constitution precluded defendant from running in the Democratic party election for the office of Lieutenant Governor/Secretary of State. The trial court dismissed the complaint, and this Court entered an order affirming the dismissal. These opinions are in support of a minute entry entered September 4, 1980.

Article VI, Section 7 provides:

No member of the Legislature, during the term for which he was elected, shall be appointed or elected to any civil office of profit under this State, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected.

The term of the office sought by the defendant was not to commence until January 1, 1981, after defendant's term as legislator had expired. The primary election for the office occurred September 9, 1980, during defendant's term as a member of the Utah State Senate. His term commenced January 1, 1977, and ended December 31, 1980. During this term, the Utah Legislature passed Senate Joint Resolution No. 7 proposing several revisions of the executive article of the Utah Constitution. The resolution required ratification by the Utah electorate in the general election of 1980. The resolution included the proposals that the name of the office of Secretary of State be changed to Lieutenant Governor and that there be a change in the method of election to this position. These revisions were passed by the voters in November 1980. Also, during defendant's senatorial term, the Legislature increased the salary of the Governor, Attorney General, Secretary of State, State Auditor, and State Treasurer. One salary increase occurred in 1977, bringing the Secretary of State's salary from $22,000 to $26,500. The Legislature again raised the salaries of the five aforementioned State officers in 1980 effective January 1, 1981. The raise for the

5. Utah, 611 P.2d 1207 (1980).

Secretary of State was $7,000, thereby increasing his annual income to $33,500.

Plaintiff contends that both the pay increases and the creation of the office of Lieutenant Governor would have prohibited the defendant from assuming that office.[1] Defendant argues that the Senate Joint Resolution did not call for the abolition of the office of Secretary of State and the creation of a new office of Lieutenant Governor. He characterizes the revision as basically a change in the name of an existing office, with the only significant difference being the requirement that the Governor and Lieutenant Governor run on the same ticket. This change will not take place until the 1984 election. Defendant further argues that, even if these modifications involved the creation of an office, they would not be the creation of the Legislature since they are dependent on the affirmative action of the Utah electorate to come into existence.[2] As to the salary increases, defendant contends that they fall within the purview of the holding and rationale of *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829 (1964). I turn to that issue first.

On facts virtually identical to the instant facts, except that the salary increases were smaller, the Court in *Shields* stated:

> The important fact here is that the salary increases involved could not by any stretch of the imagination be regarded as partaking of the impropriety just referred to.
>
> \*    \*    \*    \*    \*    \*
>
> These relatively small increases . . . should properly be regarded as just what they were, a moderate cost of living adjustment on an across-the-board basis in keeping with the steadily rising costs of living. Accordingly, it can be said with assurance that this is not a situation which would lend itself to any ulterior scheme by a legislator to set up a high

paying sinecure to take advantage of which Section Seven of Article VI was designed to prevent. [Footnote omitted.] [16 Utah 2d at 64–65, 395 P.2d at 831.]

Perhaps, as Chief Justice Maughan contends, the instant case can be affirmed on the basis that the salary increases in this case simply had the effect of keeping the salary of the office abreast of inflation, but I have my doubts. Certainly that is not true for the time period covered by the second increase, and on this record there is no way of knowing how valid the argument is as to the first. But for me there is a more fundamental and far firmer reason why Article VI, Section 7 should not be construed to prohibit the defendant from running for an executive office. In my view, that provision simply does not apply to a legislator who seeks an elective office at the end of his legislative term even if he has voted for a salary increase for that office. The provision applies only if the legislator actually takes up the duties of the elective or appointive office before the end of the legislative term for which he was elected, irrespective of whether the appointment or election occurred before the expiration of the legislative term. If he takes up the duties afterwards, the constitutional provision does not apply. Neither appointment nor election to office is in fact consummated until the office is officially assumed, and that could not have occurred in this case until after the legislative term of office expired.

To prohibit a legislator from taking another office after expiration of his legislative term could work severe disruption in governmental affairs. For example, it could prevent all legislators from succeeding themselves whenever legislative remuneration was increased.[3] Surely such a restrictive application of the provision cannot have been intended. Moreover, a legislator, though best qualified for the position, could

---

1. In the general election of November 1980 the defendant lost.

2. These proposals were adopted in the general election in November 1980.

3. At present legislative salaries are fixed by the Constitution and that fact might serve to make Article VI, Section 7 inapplicable to a salary increase by constitutional amendment, although a literal interpretation of Article VI, Section 7 would require otherwise.

not seek or accept any position in either the executive or the judicial branch without completely separating himself from government service for a period of time, during which time the position would be filled. I see no benefit to the State in such a harsh requirement. Certainly, the legitimate purposes of Article VI, Section 7 are properly effected by prohibiting a Legislator from taking up a new office during his legislative term.

The Washington Supreme Court reached the same conclusion in *State v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972 (1966), in which it interpreted an identical constitutional provision. The court stated:

[W]here the salary increase does not take effect during the term for which the legislator was elected to the legislature, he is not ineligible to stand for election to and serve in an office at a higher salary commencing with the expiration of his elected term as legislator, because no part of the increase will be earned during the legislator's incumbent term of office.

We favor an interpretation tending to unfetter the process of election as more in keeping with democratic ideals than a construction which inclines to curtail the freedom to stand for office. Despite the criticism and complaints frequently directed by the people toward their legislature, that body remains the single most democratic organ of constitutional government yet devised, reflecting with greater clarity and frequency probably than any of our institutions—save possibly the public schools—the will and aspirations of a free people. From this academy of free representative government have come some of our greatest presidents, ablest jurists, most capable members of the congress, and outstanding statesmen. Perhaps no greater school exists for the training of men to leadership in a democracy than service in a state legislature. The constitution ought, therefore, where its language is susceptible of many meanings, be construed to augment and foster rather than curb and curtail the elective process. [413 P.2d at 981–82.]

See also *People ex rel. Ellis v. Lennon*, 86 Mich. 468, 49 N.W. 308 (1891), a case construing a constitutional provision more restrictive than ours, which also supports the view that the matter of ineligibility refers only to the taking of a new office during one's incumbent term:

"The purpose of these statutes is to prevent officers from using their official positions in the creation of offices for themselves or for the appointment of themselves to place. While the law concedes the right of resignation, it is its *policy to take away all inducements to the vacation of office.*" [Emphasis added.] [49 N.W. at 310.]

Furthermore, the very fact that the office sought by the defendant is won only by general election provides an inherent safeguard against the evils sought to be thwarted by Section 7 of Article VI. That provision was enacted to protect the State government from unscrupulous machinations aimed at personal gain. *Shields v. Toronto, supra; Jugler v. Grover*, 102 Utah 41, 125 P.2d 807 (1942). I see no enfeebling of the basic purpose of Article VI, Section 7 by the view advanced here. Both legislative and executive action are subject to close scrutiny by the press and others as observed in *Shields*:

The absence of any improper machinations being practiced here is rendered even plainer by the fact that all that has been done has had full exposure to public view, and that these candidates have had full exposure to the elective process. Months before this suit was filed they had announced their candidacies for office. They had to run before and obtain the approval of the conventions of their respective parties. They were obliged to run in the public primaries against formidable opponents; and must face candidates of the opposing party in the general election. All of this with the public fully aware of all of the circumstances so they are free to approve or disapprove what the candidates have done. [Footnote omitted.] [16 Utah 2d at 65; 395 P.2d at 831–32.]

In *State ex rel. Grisby v. Ostroot*, 75 S.D. 319, 64 N.W.2d 62 (1954), the court made a similar observation:

> [T]he dangers which [this constitutional provision] sought to guard against . . . so far as elective office is concerned are minimized by modern conditions. Should it be held that intervenor is eligible to the office which he seeks he will have to run in the primary election against formidable opposition, and his candidacy, will in truth and in fact, be submitted to an electorate which through modern means will be well informed as to all his legislative acts. [64 N.W.2d at 65–66.]

Finally, there is strong reason to construe the provision so as to trench as little as possible on the right to vote and the right to seek public office, both of which are fundamental, indeed indispensible, rights inherent in the very nature of our form of government. In *Shields* this Court stated:

> [T]he natural corollary of the right to vote is the right to seek and to serve in public office. Reflection on the matter will reveal that these rights are of vital importance both to individual citizens and to the public. That the framers of our Constitution so regarded them and that these rights are correlated to each other and part of the integral rights and privileges of citizenship is plainly apparent from its numerous references to "the right to vote and hold office" in the same context. [Footnotes omitted.] [16 Utah 2d at 66; 395 P.2d at 832–33.]

Plaintiff's additional contention that the defendant was disqualified because the office of Lieutenant Governor was newly created is also without merit. There simply is no reason to apply Article VI, Section 7 to offices newly created by constitutional amendment which necessarily require voter approval.

Furthermore, the legislative proposal for a constitutional revision did not create a new office, regardless of ratification. In *State Board of Education v. Commission of Finance*, 122 Utah 164, 247 P.2d 435 (1952), the Court, in determining whether a new office is created, stated that it can only be said that a new office is created when substantially new, different, or additional functions, duties, and powers are assigned. The existing duties of the Secretary of State are substantially the same as those which will be performed by the Lieutenant Governor, and whatever changes there are do not constitute the creation of a new office. See *State v. Powell*, 109 Ohio St. 383, 142 N.E. 401 (1924); *Mayor and Commissioners of Westernport v. Green*, 144 Md. 85, 124 A. 403 (1923).

For the foregoing reasons, I voted to affirm.